No. 98,742

STATE OF KANSAS, *Appellee*, v. JAZWANE JEFFERSON, *Appellant*.

(310 P.3d 331)

1152

Opinion filed September 6, 2013.

*Michael J. Bartee*, of Michael J. Bartee, P.A., of Olathe, argued the cause and was on a brief for appellant, and *Jazwane Jefferson*, appellant pro se, filed a supplemental pro se brief.

*Edmond D. Brancart*, deputy district attorney, argued the cause, and *Michael A. Russell*, chief deputy district attorney, *Jerome A. Gorman*, district attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

MORITZ, J.: Jazwane Jefferson appeals his convictions of first-degree felony murder and the underlying felony of criminal discharge of a firearm at an occupied dwelling. Jefferson primarily argues the district court erred in failing to suppress his statements, which Jefferson contends were obtained through the officers' exploitation of the illegal seizure of his car. We agree with Jefferson that the officers unlawfully seized his car and then used that illegal seizure to obtain his incriminating statements. Further, we conclude the State failed to establish under the totality of the circumstances that Jefferson's statements were sufficiently attenuated from the preceding illegal seizure. Accordingly, we reverse the district court's suppression ruling, reverse Jefferson's convictions, and remand for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

Deborah Jackson was shot and killed in her home in Kansas City, Kansas, the victim of a drive-by shooting. After an investigation, the State charged Jefferson with several counts relating to Jackson's murder, including first-degree felony murder based on the underlying felony of criminal discharge of a firearm at an occupied dwelling, criminal discharge of a firearm at an occupied dwelling resulting in great bodily harm, and conspiracy to commit criminal discharge of a firearm at an occupied dwelling.

Before trial, Jefferson moved to suppress incriminating statements he made to detectives during an interview, claiming his statements stemmed from the detectives' illegal seizure of his car. After an evidentiary hearing, the district court denied Jefferson's suppression motion.

At trial, the State presented evidence related to the crime scene and homicide investigation, including Jefferson's videotaped statement to detectives. In that statement, Jefferson identified the participants in Jackson's shooting as himself, Marcus Carson, Arthur Herron, Joshua Jones, and Steve Coleman. According to Jefferson, on the day of the shooting, he and the other men armed themselves with guns before getting into a white van driven by Coleman. Jefferson carried a .40 caliber Smith and Wesson pistol. When they arrived at the Jackson home, Carson told everyone to "shoot the

house," and everyone in the van fired their weapons. Jefferson stated he did not know which house he was shooting at, but he fired his weapon so that the other men in the vehicle would not think that he was scared or would report the crime. At trial, Jefferson essentially reiterated the admissions he made in his videotaped interview.

Through the testimony of several witnesses, including Jefferson, the State established that Jackson's shooting was the last in a series of shootings that occurred on that day. Some of the shootings were committed either by Carson or Jackson's adult son, Eric Jackson. Jackson's husband testified that Eric Jackson and the Carson family had an ongoing feud.

At the close of evidence, the district court granted Jefferson's request to dismiss the conspiracy charge. During the jury instruction conference, the district court denied Jefferson's request for a lesser included offense instruction on criminal discharge of a firearm. The jury found Jefferson guilty of first-degree felony murder and the underlying felony of criminal discharge of a firearm at an occupied dwelling resulting in great bodily harm.

The district court sentenced Jefferson to life in prison with no possibility of parole for 20 years, plus a consecutive prison term of 59 months. Jefferson appeals.

Our jurisdiction to consider this appeal arises under K.S.A. 22-3601(b)(1) (Furse 1995) (direct criminal appeal; life sentence imposed; off-grid crime).

### THE DISTRICT COURT ERRED IN DENYING THE DEFENDANT'S SUPPRESSION MOTION

Citing the Fourth Amendment to the United States Constitution, Jefferson claims the district court erroneously denied his motion to suppress incriminating statements he made to detectives. Jefferson argues the detectives illegally seized his car without a warrant or probable cause and his statements derived from this illegal seizure should have been suppressed as fruit of the poisonous tree.

The State contends the detectives lawfully seized Jefferson's vehicle based on probable cause to believe the vehicle might contain

evidence related to the homicide and properly impounded the vehicle until they could obtain a search warrant based on that belief. Alternatively, the State argues the district court properly denied the suppression motion because Jefferson's statements were sufficiently attenuated from any illegal seizure.

*Standard of Review*

Without reweighing the evidence, we review the factual underpinnings of a district court's suppression ruling under a substantial competent evidence standard. But we review the court's ultimate legal conclusion regarding suppression de novo. *State v. Edwards*, 291 Kan. 532, 545, 243 P.3d 683 (2010).

*Suppression Hearing and District Court Ruling*

The following factual summary is based on the testimony of the only witness at the suppression hearing, Detective Greg Lawson.

Jackson was shot on September 20, 2004. About 30 minutes after the shooting, officers located the white van used in the shooting but found no weapons in the van. Based on their investigation, including their knowledge of other shootings occurring the same day as Jackson's shooting, Lawson and his partner, Detective Michael York, initially suspected Marcus Carson and brothers Arthur Herron and Alex Herron of participating in Jackson's shooting.

But 9 days after the shooting, Jefferson became a suspect when Alex Herron advised Lawson that Carson and Jefferson came to the Herrons' home after Jackson's shooting. After speaking with Alex Herron, the detectives verified Jefferson's address and identified a Monte Carlo parked in his apartment complex's parking lot as belonging to Jefferson.

Nearly 1 month after Jackson's shooting, Arthur Herron advised Lawson that Jefferson participated in the shooting. Then, on Saturday, October 23, 2004, Arthur Herron gave a videotaped statement to detectives implicating himself, Jefferson, Carson, Coleman, and Jones in the shooting.

Immediately after obtaining Arthur Herron's statement, Lawson and York went to Jefferson's apartment complex. When they arrived at the complex, they observed Jefferson's car parked in the

parking lot with the engine running, and they saw a person they believed to be Jefferson walking towards the car. Lawson said, "[H]ello," identified himself as a detective, and advised Jefferson he needed to speak with him. Jefferson then fled on foot from the detectives.

Leaving the car unattended, Lawson and York chased Jefferson. But they lost sight of Jefferson and could not locate him even after canvassing the neighborhood. When Lawson and York returned to the apartment complex parking lot about 15 minutes later, they found that Jefferson's car engine had been turned off and the keys had been removed from the ignition. Lawson testified he knew the keys were in Jefferson's car before the detectives chased Jefferson because "[t]he vehicle was started and the column wasn't punched."

The detectives knocked on Jefferson's apartment door but received no response. Lawson and York decided to "tow[] the car in preparation to obtain a search warrant for any kind of weapons or evidence of any kind that would reference this homicide due to the confession of Mr. Herron and then Mr. Jefferson was involved and was, in fact, our main weapon [sic]."

York placed a card on Jefferson's apartment door with the following handwritten message: "Jazwane, if you want your car back, please give me a call. We can talk, York." Lawson testified York left the note so Jefferson would know the police possessed his car.

The officers had Jefferson's car towed to a secure location that same afternoon, Saturday, October 23, 2004. Soon thereafter, Lawson left for Missouri to investigate a different case. According to Lawson, he and York did not work on Sunday and Monday, but they planned to obtain a search warrant when they returned to work on Tuesday.

Lawson testified he prepared an affidavit for the search warrant but did not present it to a judge or meet with the district attorney. Nevertheless, Lawson claimed the affidavit asserted: (1) Arthur Herron identified Jefferson as one of the shooters in Jackson's shooting, (2) officers recovered no weapons in the van involved in the shooting, and (3) Jefferson ran from the detectives when they approached him at his apartment complex. Lawson testified that

when he prepared the affidavit, he had no specific knowledge that weapons would be found in Jefferson's car, but he believed they might find "weapons, shell casings and/or bullets" in the car. Lawson later clarified he was "in the process" of preparing the affidavit the morning the detectives interviewed Jefferson and that the detectives "were going to go in front of a judge before" they picked up Jefferson. Finally, when the district court judge indicated he would order the State to produce the affidavit, Lawson admitted he never actually printed the affidavit but claimed he might have saved it on his computer's hard drive.

In any event, Lawson testified that on Monday, October 25, 2004, Jefferson called York. According to Lawson, York advised Jefferson the detectives would be "returning to work on Tuesday, October 26, and we told him to give us a call and he could come down to the detective bureau and we could talk about the situation." Jefferson further advised York he would be at the detective bureau around 11 a.m. that Tuesday, October 26, 2004. But Jefferson did not arrive when expected. Lawson testified:

"I don't remember if he called Detective York or Detective York called him to ask what the delay was, but he had said that he did not have a ride. His ride had fell through. He could not make it down there and Detective York asked him if he wanted us to pick him up or did he anticipate getting a ride in the near future. Mr. Jefferson said, well, you might as well come pick me up. I don't know whether a ride may be coming. So that's what we did."

Lawson and York picked up Jefferson at his apartment and advised him they "were in the process of obtaining a search warrant for the car" and planned to search the car after obtaining the warrant. According to Lawson, Jefferson told the officers, "[T]here's nothing in the car. I can assure you of that. You know, I have nothing to hide. You can search the car." Further, Jefferson agreed to sign a written consent permitting a search of his car "in order to cooperate with the investigation."

When they arrived at the detective bureau, the detectives took Jefferson to an interview room and immediately advised him of his *Miranda* rights. See *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). About 15 minutes into the interview, Jefferson agreed to provide an audiotaped statement. Before

taking the statement, detectives *Mirandized* Jefferson a second time, and Jefferson signed both a written *Miranda* waiver form and a written consent to search his car. The detectives read the *Miranda* waiver form to Jefferson a third time at the start of his audiotaped statement. In that statement, Jefferson told detectives he had heard about Jackson's shooting but he had no firsthand knowledge of it.

After Jefferson gave the audiotaped statement, detectives suggested his statements conflicted with other evidence discovered during the investigation, and they encouraged him to tell the truth. Jefferson eventually admitted his participation in the shooting and provided information consistent with the information detectives received from Arthur Herron. Jefferson also agreed to provide a videotaped statement memorializing his admissions.

At the start of the videotaped statement, detectives again *Mirandized* Jefferson, who indicated he understood his rights and that he had not been coerced or mistreated by the detectives. The detectives arrested Jefferson after he gave the statement.

According to Lawson, the detectives eventually searched Jefferson's car pursuant to Jefferson's consent and found nothing of evidentiary value.

Following the suppression hearing, the district court ruled that the detectives could reasonably have believed that evidence related to the homicide would be found in Jefferson's car based on Lawson's testimony that the detectives suspected Jefferson was involved in Jackson's homicide, officers had not found any of the weapons used in the homicide, and Jefferson had fled from the vicinity of his car when officers approached him. Further, the district court noted that the detectives eventually planned to question Jefferson as a homicide suspect based on leads they had already developed.

In ultimately denying Jefferson's suppression motion, the district judge commented, "Whether [the detectives] used the car as leverage to elicit a statement from [Jefferson], I think that's—that's stretching it." At trial, the district court reaffirmed its suppression ruling, overruling Jefferson's renewed objection to the introduction of his videotaped statement.

*The detectives unlawfully seized Jefferson's car.*

In this appeal, Jefferson primarily challenges the district court's denial of his motion to suppress. The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Section 15 of the Kansas Constitution Bill of Rights provides the same guarantee. See *State v. Thompson*, 284 Kan. 763, 772, 779-80, 166 P.3d 1015 (2007).

Jefferson argues the detectives lacked probable cause to seize his car, acting in violation of the Fourth Amendment. A warrantless seizure of a vehicle is per se unreasonable unless one of the recognized exceptions to the Fourth Amendment's warrant requirement applies. See *State v. Fisher*, 283 Kan. 272, 292, 154 P.3d 455 (2007).

"Under the automobile exception to the Fourth Amendment's warrant requirement, which is a subclass of the probable-cause-plus-exigent-circumstances exception, the mobility of the vehicle provides the exigent circumstances without the necessity of proving anything more. If a vehicle is readily mobile and probable cause exists to believe the vehicle contains contraband or evidence of a crime, the Fourth Amendment does not require a warrant for police to search the vehicle." *State v. Sanchez-Loredo*, 294 Kan. 50, Syl. ¶ 4, 272 P.3d 34 (2012).

" 'Probable cause' to search a vehicle can be established if the totality of the circumstances indicates there is a 'fair probability' that the vehicle contains contraband or evidence [of a crime]." 294 Kan. at 55. And, if law enforcement officers have probable cause to search a vehicle at the scene, they also have probable cause to seize the vehicle and search it at a later, more convenient time. See 294 Kan. at 56-57 (agreeing with *Chambers v. Maroney*, 399 U.S. 42, 52, 90 S. Ct. 1975, 26 L. Ed. 2d 419 [1970], that if probable cause exists there is no significant distinction " 'between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant' "); *State v. Taylor*, 217 Kan. 706, 710-11, 538 P.2d 1375 (1975) ("If the police had probable cause to search the truck at the time it was discovered and defendant arrested, they had probable cause to impound it and search it at a later, more convenient time.").

We agree with the State that substantial competent evidence supports the district court's factual findings that at the time detectives seized Jefferson's vehicle, detectives knew that (1) officers found no weapons in the van used in the shooting, (2) Carson and his associates were suspects in the shooting, (3) Alex Herron advised detectives that Jefferson was with Carson after the shooting, (4) Arthur Herron identified Jefferson as one of the shooters, and (5) Jefferson ran from detectives when they attempted to talk with him.

But we disagree with the district court's legal determination that this information established probable cause to seize Jefferson's car. Significantly, Jefferson had been a suspect since 9 days after the shooting when Alex Herron told detectives Jefferson was with Carson after the shooting. Lawson testified he and York attempted to locate Jefferson after speaking with Alex Herron and, at some point, they went to Jefferson's apartment complex, verified his address, and identified his car. Despite the detectives' awareness of the location of Jefferson's residence and vehicle, the detectives did not seek a search warrant for Jefferson's vehicle at that time.

Nearly a month after Jackson's homicide, Jefferson became a primary suspect when Arthur Herron told the detectives Jefferson participated in the shooting. Armed with this statement, the detectives still failed to seek a search warrant for Jefferson's vehicle. Instead, immediately after interviewing Arthur, the detectives went to Jefferson's apartment complex hoping to talk to Jefferson.

Upon their arrival, Lawson and York saw Jefferson's car in the parking lot, noticed the engine running, and saw Jefferson walking towards the car. But when Jefferson fled, Lawson and York did not immediately secure the vehicle, despite their later suggestion that it may have contained evidence related to Jackson's murder. Instead, Lawson and York left Jefferson's car unattended with its engine running and chased Jefferson. When they returned to the parking lot about 15 minutes later, they found Jefferson's car engine had been turned off and the keys had been removed from the ignition. Finally, the detectives knocked on the door of Jefferson's apartment and received no response before they decided to tow his vehicle.

Thus, although Jefferson was a suspect in Jackson's shooting at the time the detectives seized his vehicle, there is simply no evidence in the record linking the shooting to Jefferson's vehicle. In fact, the evidence contradicts such a link. Detectives had recovered the van used in the shooting and had found no weapons in that vehicle. Moreover, the shooting occurred more than a month before detectives seized Jefferson's vehicle, making any potential link between Jefferson's vehicle and the shooting even more tenuous. Additionally, the detectives acted inconsistently with their later claim of probable cause when they went to Jefferson's apartment—not to search his vehicle—but only to talk with Jefferson. And finally, the detectives allowed Jefferson's car to remain unattended, with keys in the ignition and the engine running, while they chased Jefferson. The officers simply did not act in a manner indicating a fair probability that the vehicle contained contraband or evidence of the homicide.

Under the totality of the circumstances, we find no support in the record for the district court's conclusion that the detectives had probable cause to believe Jefferson's car contained weapons or any other evidence related to Jackson's homicide.

*The detectives exploited the illegal seizure of Jefferson's car to obtain his incriminating statements, and those statements are not sufficiently attenuated from the illegal seizure.*

Because the detectives unlawfully seized Jefferson's car, we must next consider whether the exclusionary rule required suppression of his statements. See *State v. McGinnis*, 290 Kan. 547, 551, 233 P.3d 246 (2010) (when State fails to meet its burden to establish lawfulness of challenged search or seizure, any evidence obtained through exploitation of the illegal search or seizure may be suppressed through application of the exclusionary rule); see also *Herring v. United States*, 555 U.S. 135, 140-48, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009) (explaining limits and purposes of exclusionary rule).

Jefferson argues the exclusionary rule applies here because his incriminating statements were the poisonous fruit of the illegal seizure. The fruit of the poisonous tree doctrine is "one facet of

the exclusionary rule" and "extend[s] the scope of the exclusionary rule to bar" admission of evidence directly or indirectly obtained as a result of unlawful police conduct. *State v. Deffenbaugh*, 216 Kan. 593, 598, 533 P.2d 1328 (1975); see also *Wong Sun v. United States*, 371 U.S. 471, 487-88, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963) (explaining fruit of poisonous tree doctrine).

But there are exceptions to the exclusionary rule. One such exception is the attenuation doctrine, and the State contends that doctrine, rather than the fruit of the poisonous tree doctrine, applies here. "Under the attenuation doctrine, courts have found that the poisonous taint of an unlawful search or seizure dissipates when the connection between the unlawful police conduct and the challenged evidence becomes attenuated." *State v. Martin*, 285 Kan. 994, 1003, 179 P.3d 457, *cert. denied* 555 U.S. 880 (2008).

The State bears the burden to establish sufficient attenuation to purge the taint of an illegal search or seizure and avoid application of the exclusionary rule. "To demonstrate that the taint of an illegal seizure has dissipated, 'the government must prove, from the totality of the circumstances, a sufficient attenuation or break in the causal connection between the illegal detention and the consent.' " *United States v. Fox*, 600 F.3d 1253, 1259 (10th Cir. 2010).

In determining whether a defendant's confession is sufficiently attenuated from a preceding illegal search or seizure we generally consider: (1) whether *Miranda* warnings were given, (2) the temporal proximity of the illegal conduct and the statement, (3) the purpose and flagrancy of the officers' misconduct, and (4) other intervening circumstances. *State v. Hill*, 281 Kan. 136, 153, 130 P.3d 1 (2006); see *State v. Knapp*, 234 Kan. 170, 177, 671 P.2d 520 (1983). But no one factor controls, and other factors may be relevant to the analysis. *State v. Moralez*, 297 Kan. 397, Syl. ¶ 12, 300 P.3d 1090 (2013); see also *Fox*, 600 F.3d at 1259 (noting that government must prove sufficient attenuation under totality of circumstances).

### Miranda *Warnings*

In this case, there is no dispute that Jefferson repeatedly received *Miranda* warnings. While this factor weighs in favor of at-

tenuation, the giving of *Miranda* warnings is never sufficient, standing alone, to purge the taint of an illegal seizure. See *Taylor v. Alabama*, 457 U.S. 687, 690, 102 S. Ct. 2664, 73 L. Ed. 2d 314 (1982) ("the fact that the confession may be 'voluntary' for purposes of the Fifth Amendment, in the sense that *Miranda* warnings were given and understood, is not by itself sufficient to purge the taint of the illegal arrest"); *Brown v. Illinois*, 422 U.S. 590, 600-04, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975) (concluding that giving of *Miranda* warnings, standing alone, cannot support attenuation when confession follows unlawful arrest).

*Temporal Proximity*

The State argues the temporal proximity factor also weighs in favor of the State because 3 days passed between the illegal seizure of Jefferson's car and Jefferson's incriminating statements and Jefferson was not in custody during that time period. But Jefferson argues this factor does not weigh in favor of attenuation because the detectives continued to deprive him of his car during the entire 3-day period. Jefferson distinguishes this case from *Wong Sun*, where officers unlawfully arrested the defendant and released him, and several days later the defendant returned to meet with law enforcement officers and confess.

We find Jefferson's reasoning persuasive. Jefferson's vehicle, not his person, was the object of the illegal seizure, and nothing in the record indicates the detectives released Jefferson's car to him before obtaining his incriminating statements.

*Purposeful and Flagrant Conduct*

We also agree with Jefferson that the detectives acted purposefully and flagrantly in unlawfully seizing his vehicle. Significantly, rather than simply leaving a note to apprise Jefferson that his car had been seized, York left a note stating, "Jazwane, if you want your car back, please give me a call. We can talk, York." This note conveyed a clear and simple message—Jefferson would not get his car back until he talked to York.

Nor does the record suggest York conveyed a different message when Jefferson initially contacted York after receiving the note. Notably, York did not testify at the suppression hearing, and

Lawson's testimony regarding his secondhand knowledge of York's phone conversation with Jefferson reinforced the message that the detectives were holding Jefferson's vehicle in order secure Jefferson's presence. Specifically, Lawson testified that York told Jefferson the detectives wanted to talk to him about the homicide.

Our finding that the detectives acted flagrantly is further supported by the detectives' failure to take any substantial steps toward obtaining a search warrant either before or after seizing Jefferson's car. As Jefferson points out, several days (and possibly weeks) before the detectives seized Jefferson's vehicle, the detectives confirmed Jefferson's address and the description of his car, yet they never sought a search warrant until after they attempted to talk with him at his apartment. And the detectives abandoned the vehicle when Jefferson fled, contradicting any belief that the car contained valuable evidence of a homicide. Instead, the detectives seized Jefferson's car without probable cause, taped what could be characterized as a "ransom" note on Jefferson's apartment door, and then held the car for 3 days without applying for a search warrant. Ultimately, Lawson testified he prepared but never printed an affidavit for the warrant, never spoke to the district attorney about obtaining a warrant, and never went before a judge to apply for a warrant. Taken together, these facts lend credence to Jefferson's assertion that "the seizure of Jefferson's car was an unlawful ruse to force him to contact police."

*Intervening Circumstances*

Finally, Jefferson contends there were no intervening circumstances to support attenuation. Relying on *State v. Kirby*, 12 Kan. App. 2d 346, 744 P.2d 146 (1987), *aff'd* 242 Kan. 803, 751 P.2d 1041 (1988), the State emphasizes that after officers seized his car, Jefferson called and spoke with York to arrange a meeting, and York told Jefferson that the detectives wanted to discuss the homicide investigation.

In *Kirby*, law enforcement officers initiated a traffic stop, performed an unlawful roadside search of the defendant's truck, seized the truck, and then performed an unlawful inventory search in which they "rediscovered" items found during the initial roadside

search. Five days later, the defendant went to the police station to retrieve his truck and spoke with a detective. After receiving *Miranda* warnings, the defendant signed a statement confessing to a residential burglary and was arrested. Before trial, the district court denied the defendant's motions to suppress the evidence seized from the truck and his confession.

The Court of Appeals panel in *Kirby* concluded both searches were unlawful, but the panel nevertheless found the defendant's statements admissible at trial. The panel rejected the defendant's argument that "[the defendant] was forced into presenting himself to the detectives to get the truck back, which would not have occurred had there been no illegal search and seizure of the truck" and that the *Miranda* warnings were insufficient to purge the taint of the illegal seizure of the truck. 12 Kan. App. 2d at 357.

Specifically, the panel reasoned that the defendant had freely and voluntarily contacted the officers knowing they possessed his truck and the stolen items found therein and that the defendant's voluntary act attenuated the confession. 12 Kan. App. 2d at 358. Additionally, the panel noted the defendant had not been arrested, "nor did he feel any fear or pressure from the police to either initially contact them or subsequently meet with the detective. His motive in going to the station and giving a statement was purely personal." 12 Kan. App. 2d at 359.

Although this court summarily affirmed the panel's decision in *Kirby*, we now disapprove of any language in *Kirby* suggesting a defendant's act of contacting law enforcement officers to retrieve the defendant's illegally seized property is "purely personal" and will automatically constitute an act of free will sufficient to purge the taint of an illegal seizure. Further, we find the facts of this case distinguishable from the facts in *Kirby*.

In *Kirby*, law enforcement officers clearly were interested in the defendant's vehicle from the time of the stop and remained interested in the vehicle as demonstrated by the inventory search. Here, in contrast, the detectives' actions indicate they developed an interest in the vehicle only after Jefferson ran from them and could not be located. These facts do not support the State's assertion that

the detectives believed evidence of the crime remained in Jefferson's car more than a month after Jackson's shooting.

Consequently, we have no hesitancy in concluding here that the detectives exploited their illegal seizure of Jefferson's car to obtain his incriminating statements. And the State has failed to establish under the totality of the circumstances that Jefferson's statements are sufficiently attenuated from the preceding illegal seizure. Accordingly, we reverse the district court's suppression ruling, reverse Jefferson's convictions, and remand the case for further proceedings consistent with this opinion.

## THE STATE PRESENTED EVIDENCE SUFFICIENT TO SUPPORT JEFFERSON'S CONVICTIONS

Because we are reversing Jefferson's convictions and remanding for further proceedings, we must also consider Jefferson's challenge to the sufficiency of the evidence. If the evidence presented during the first trial was insufficient to support his convictions, a second trial on the same charges would violate Jefferson's right to be free from double jeopardy. See *State v. Hernandez*, 294 Kan. 200, 209, 273 P.3d 774 (2012) (noting that when reversal is appropriate on at least one ground, court must address challenge to sufficiency of evidence for double jeopardy purposes). Notably, even though we have determined that the district court erred in admitting Jefferson's videotaped statement, we must nevertheless consider that erroneously admitted evidence in reviewing the sufficiency of the evidence presented at the first trial. See *State v. Pabst*, 268 Kan. 501, 512, 996 P.2d 321 (2000) (citing *Lockhart v. Nelson*, 488 U.S. 33, 41, 109 S. Ct. 285, 102 L. Ed. 2d 265 [1988], for proposition that reviewing court must consider all evidence admitted by trial court in deciding whether retrial is permissible under Double Jeopardy Clause).

### Standard of Review

" ' "When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." ' [Citation omitted.]" *State v. McCaslin*, 291 Kan. 697, 710, 245 P.3d 1030 (2011).

*Analysis*

In determining whether sufficient evidence supports a conviction, we do not reweigh the evidence or the credibility of witnesses. 291 Kan. at 710. And, "[w]hile the State must sustain its burden of proof on each element of an offense, circumstantial evidence and the logical inferences therefrom can be sufficient to support a conviction of even the most serious crime." *State v. Herron*, 286 Kan. 959, 967, 189 P.3d 1173 (2008).

The jury convicted Jefferson of (1) first-degree felony murder based on the underlying felony of criminal discharge of a firearm at an occupied dwelling that resulted in the death of Jackson, and (2) criminal discharge of a firearm at an occupied dwelling that resulted in great bodily harm to Jackson.

First-degree felony murder is "the killing of a human being committed . . . in the commission of, attempt to commit, or flight from an inherently dangerous felony." K.S.A. 21-3401(b). Criminal discharge of a firearm at an occupied dwelling is an inherently dangerous felony. K.S.A. 21-3436(a)(15).

The statute prohibiting criminal discharge of a firearm has been amended since Jefferson's trial, but the statute in effect at the time of the shooting defined the crime as "the malicious, intentional and unauthorized discharge of a firearm at a dwelling . . . in which there is a human being." K.S.A. 21-4219(b). The State charged Jefferson with a severity level 3 person felony based on the fact that the crime resulted in great bodily harm to Jackson. See K.S.A. 21-4219(b) (setting forth varying severity levels of crime). The trial court instructed the jury that the term " 'intentionally' means conduct that is purposeful and willful and not accidental." The trial court further instructed the jury that the term " '[m]aliciously' means willfully doing a wrongful act without just cause or excuse."

The jury also was instructed on the theory of aiding and abetting. Under that theory, a defendant may be held "criminally responsible for a crime committed by another if such person intentionally aids, abets, advises, hires, counsels or procures the other to commit the crime." K.S.A. 21-3205(1).

"[M]ere association with a principal who actually commits a crime or mere presence in the vicinity of the crime is itself insufficient to establish guilt as an aider

and abettor. However, when a person knowingly associates with an unlawful venture and participates in a way that demonstrates willful furtherance of its success, guilt as an aider and abettor is established. [Citations omitted.]" *Herron*, 286 Kan. at 968.

At trial and in his videotaped statement, Jefferson admitted he participated in Jackson's shooting and that he was the only person armed with a .40 caliber Smith and Wesson semiautomatic pistol. Although the State established that Jackson was killed by bullets of a different caliber, it also proved that four of the .40 caliber Smith and Wesson cartridge cases recovered from the van used in the shooting were fired from a single weapon. Additionally, four of the bullets and bullet fragments recovered from the crime scene at the Jackson home—one of which was embedded in the front door and one of which was found in a bedroom—were .40 caliber Smith and Wesson bullets.

Further, at trial and in his videotaped statement, Jefferson testified he knew about the shootings that had occurred earlier in the day before he got into the van with Carson, Coleman, Arthur, and Jones, all of whom were armed, and that he knew others believed Jackson's son was responsible for some of the earlier shootings.

Viewing this evidence in the light most favorable to the State, we conclude a rational factfinder could have found beyond a reasonable doubt that Jefferson maliciously and intentionally, without authorization, discharged a firearm at an occupied dwelling. See K.S.A. 21-4219(b). Further, even though his bullets did not cause great bodily harm to Jackson, a rational factfinder could have concluded beyond a reasonable doubt that Jefferson was culpable for that harm because he knowingly associated with the unlawful venture of discharging a firearm at the occupied dwelling and participated in a way that demonstrated willful furtherance of its success. See K.S.A. 21-3205(1); *Herron*, 286 Kan. at 968.

Finally, because the evidence is sufficient to sustain Jefferson's conviction for the underlying felony of criminal discharge of a firearm at an occupied dwelling resulting in great bodily harm, and it is undisputed that Jackson was killed during the commission of that felony, the evidence also is sufficient to sustain Jefferson's felony-

murder conviction. Accordingly, a second trial on the same charges will not violate Jefferson's right to be free from double jeopardy.

## JEFFERSON'S CONVICTIONS ARE NOT MULTIPLICITOUS

Next, Jefferson claims his convictions are multiplicitous. The State argues, however, that Jefferson's multiplicity claim is precluded by *State v. Conway*, 284 Kan. 37, Syl. ¶ 9, 159 P.3d 917 (2007), and *State v. Walker*, 283 Kan. 587, Syl. ¶ 23, 153 P.3d 1257 (2007). Though we have reversed Jefferson's convictions on other grounds, we will address this issue because it may arise on remand. See *Hernandez*, 294 Kan. at 208-09 (noting that courts may address issues likely to arise on remand when reversing on other grounds).

We have previously held that convictions of felony murder, K.S.A. 21-3401(b), and criminal discharge of a firearm at an occupied vehicle or occupied dwelling, K.S.A. 21-4219(b), are not multiplicitous even when the charges arise from the same conduct and involve the same victim. See *State v. Farmer*, 285 Kan. 541, 548-49, 175 P.3d 221 (2008) (rejecting multiplicity/double jeopardy claim when defendant was convicted of first-degree felony murder and criminal discharge of firearm at occupied vehicle resulting in great bodily harm based on shooting death of single victim); *Walker*, 283 Kan. at 609-13 (rejecting multiplicity/double jeopardy claim when defendant was convicted of first-degree felony murder and criminal discharge of firearm at occupied dwelling based on shooting death of single victim). Accordingly, we reject Jefferson's multiplicity claim.

## JEFFERSON'S REQUEST FOR A LESSER INCLUDED OFFENSE INSTRUCTION ON CRIMINAL DISCHARGE OF A FIREARM WAS LEGALLY APPROPRIATE

Finally, since we are remanding this case for further proceedings, we briefly address Jefferson's claim that the district court erred in denying his request for a lesser included offense instruction on criminal discharge of a firearm. This issue is also likely to arise on remand. See *Hernandez*, 294 Kan. at 208-09. Jefferson argues the instruction was legally and factually appropriate, while the State contends the instruction was properly omitted because

criminal discharge of a firearm is not a lesser included offense of criminal discharge of a firearm at an occupied dwelling and the facts did not support giving the instruction.

*Standards of Review*

After the parties filed their briefs and presented oral arguments in this case, we clarified the appropriate framework and standards for reviewing alleged instruction errors:

"(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012)." *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d. 202 (2012).

*Analysis*

We conclude the requested instruction was legally appropriate. We agree with Jefferson that criminal discharge of a firearm is a lesser included crime of criminal discharge of a firearm at an occupied dwelling resulting in great bodily harm because it is a lesser degree of the same crime. See K.S.A. 21-3107(2)(a).

At the time of Jackson's shooting, K.S.A. 21-4217(a) provided, in relevant part:

"(a) Criminal discharge of a firearm is the discharge of any firearm:
(1) Upon any land or nonnavigable body of water of another, without having obtained permission of the owner or person in possession of such land; or
(2) upon or from any public road, public road right-of-way or railroad right-of-way that adjoins land of another without having first obtained permission of the owner or person in possession of such land."

Criminal discharge of a firearm at an occupied building was defined as "the malicious, intentional and unauthorized discharge of a firearm at a dwelling . . . in which there is a human being." K.S.A. 21-4219(b). Where, as here, the crime resulted in great bodily harm, it was classified as a severity level 3 person felony. K.S.A. 21-4219(b).

We conclude that one who participates in a drive-by shooting at an occupied dwelling necessarily violates K.S.A. 21-4217(a) by discharging his or her firearm "from any public road . . . that adjoins land of another" without the landowner's permission. The absence of the additional elements of malice, intent, and an occupied dwelling that are required to establish a violation of K.S.A. 21-4219(b) supports Jefferson's position that K.S.A. 21-4217(a) is a lesser degree of the same crime. Thus, the requested jury instruction was legally appropriate.

Given our decision to remand this case for further proceedings, we need not determine whether the instruction was factually appropriate or whether it was harmless to omit the instruction. See *Plummer*, 295 Kan. 156, Syl. ¶ 1. Instead, we hold only that the instruction was legally appropriate. If Jefferson is retried and he requests the same instruction at his new trial and the district court finds factual support for the instruction, the instruction should be given.

The district court's suppression ruling is reversed, Jefferson's convictions are reversed, and this case is remanded for further proceedings consistent with this opinion.

\* \* \*

BEIER, J., concurring: I join the court's opinion in all respects and write separately only to point out an underlying assumption and the existence of competing arguments on its accuracy.

In addressing Jefferson's sufficiency challenge, we assume without deciding that it is appropriate to examine *all* of the evidence admitted at trial rather than limiting our review to the evidence admitted *minus* that portion we have decided should have been excluded as fruit of the poisonous tree. Jefferson did not argue that we should do otherwise, which differentiates him from the defendant in *State v. Henderson*, 284 Kan. 267, 296-98, 160 P.3d 776 (2007), whose argument for limitation of the universe of evidence to be considered on an insufficiency claim was not only made but accepted by the State in its appellate brief. We followed the parties' lead in that case, despite our citation to *Lockhart v. Nelson*, 488 U.S. 33, 41, 109 S. Ct. 285, 102 L. Ed. 2d 265 (1988).

In *Lockhart,* the United States Supreme Court stated that retrial of a criminal defendant is permissible under the Double Jeopardy Clause as long as the evidence offered in the original trial, even if erroneously admitted, was sufficient to sustain a guilty verdict. 488 U.S. at 41-42. But *Lockhart* did not involve a situation in which the impermissible evidence should have been excluded on a constitutional ground; rather, the evidence was inadmissible because state law dictated that it lacked probative value. See 488 U.S. at 37; see also *State v. Pabst,* 268 Kan. 501, 512, 996 P.2d 321 (2000) (citing *Lockhart;* reversal required because of prosecutorial misconduct; inadmissible evidence not at issue).

There is no discernible sign that the Supreme Court is backing away from its *Lockhart* language. See *McDaniel v. Brown,* 558 U.S. 120, 131, 130 S. Ct. 665, 175 L. Ed. 2d 582 (2010) (quoting *Lockhart,* 488 U.S. at 41-42). And certain other jurisdictions have interpreted that language to apply even when constitutional error required the exclusion of admitted evidence. See, *e.g., United States v. Quinn,* 901 F.2d 522, 531 (6th Cir. 1990) (testimony admitted in violation of Confrontation Clause considered in sufficiency analysis).

But there is at least a colorable argument that *Lockhart* should be distinguished when exclusion arises from constitutional error. There is also a colorable argument that Kansas does or should do more to ensure that a constitutional right is not cheapened by allowing retrial when the evidence admitted in the original trial minus the portion that should have been excluded would not have proved the State's case. Virginia has adopted such an approach. See *Rushing v. Commonwealth,* 284 Va. 270, 279-80, 726 S.E.2d 333 (2012) (appellate court may not consider evidence illegally admitted at trial when reviewing sufficiency of the evidence; double jeopardy analysis appropriate only if defendant retried), *superseded by statute as stated in Bynum v. Commonwealth,* No. 0854-12-1, 2013 WL 2393145, at *5-6 (Va. App. 2013) (unpublished opinion). If a similar approach were to be taken in this case, I have serious doubts that Jefferson could be retried. His convictions rested largely on words from his own mouth that we have now ruled the jury should never have heard.

At this moment I am able to anticipate at least one counterargument to the two arguments outlined in the preceding paragraph: When a defendant already is entitled to reversal of a conviction because of nonharmless constitutional error in admission of evidence, he or she is not also entitled to immunity from retrial under the Double Jeopardy Clause if the State's evidence minus that which should have been excluded was insufficient; because the State may have marshaled and presented *more and/or different* evidence against the defendant if the erroneous exclusion ruling had not occurred. At least one of our sister jurisdictions has taken this position. See *Stephans v. State,* 127 Nev. 712, 721, 262 P.3d 727 (2011) (consideration of all evidence appropriate because appellate court cannot know what evidence might have otherwise been offered absent improper ruling).

I look forward to hearing from able counsel on these and other arguments and counterarguments concerning the meaning and reach of *Lockhart* in future cases.