NOT DESIGNATED FOR PUBLICATION

No. 121,237

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DONALD PERRY JONES,
*Appellant*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; NANCY E. PARRISH, judge. Opinion filed March 19, 2021. Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Jodi Litfin*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before GREEN, P.J., MALONE and WARNER, JJ.

PER CURIAM: Donald Perry Jones appeals his convictions of distributing methamphetamine and unlawful use of drug paraphernalia. Jones was the target of an investigation based in part on information from a confidential informant (CI), and the evidence was seized during a traffic stop following a dog sniff and search of Jones' car. Jones claims that (1) law enforcement did not have reasonable suspicion to extend the traffic stop for a dog sniff; (2) law enforcement did not have probable cause to search the interior of his car; (3) the district court erred in denying his motion to disclose the identity of the CI; and (4) there was insufficient evidence to support his conviction of distributing methamphetamine. Finding no error, we affirm the district court's judgment.

1

FACTUAL AND PROCEDURAL BACKGROUND

In December 2017, Topeka Police Officer Bryan Stricklin began investigating Jones after a CI told him that Jones trafficked methamphetamine. Stricklin conducted physical surveillance and observed two controlled buys between the CI and Jones. Based on the controlled buys, Stricklin obtained a GPS search warrant and attached a GPS tracking device to Jones' car in January 2018. Two or three times, Stricklin noticed that Jones left Topeka and went to a specific location in Kansas City.

On February 13, 2018, Stricklin received a text message from the CI stating that Jones was going to Kansas City to pick up methamphetamine. At the same time, he also received a notification from the GPS that Jones had left Topeka. Stricklin watched the GPS to confirm that Jones went to the same location in Kansas City. Stricklin decided to stop Jones when he returned to Topeka, and he asked Topeka Police Officer Joshawa Heaslet to assist him. Stricklin told Heaslet about his prior investigation, including the two controlled buys and the GPS monitoring. Stricklin asked Heaslet "to stop the vehicle in regards to interdicting the controlled substance." Stricklin was not involved in the stop.

When Jones returned from Kansas City and came into the Topeka city limits, Heaslet stopped him for a window tint violation. Heaslet approached the car and asked Jones for his documentation. Topeka Police Canine Officer Josh Miller also responded to the stop. Heaslet took Jones' documentation and went back to his patrol car. About six minutes into the stop, Heaslet returned to the car and gave Jones a warning ticket for the window tint violation. Heaslet began to walk away but returned and asked Jones more questions, including whether he would consent to a car search. Jones did not give consent for a search. At that point, about seven minutes into the stop, Heaslet told Jones to exit the car so that Miller could conduct an exterior dog sniff.

Miller then conducted an exterior dog sniff while Heaslet talked to Jones outside the car. Miller started to move the dog around the car and when the dog went to sniff the upper seam of the driver's side door, he went towards the open window and the dog's posture changed: he began to engage in a deep sniff and his tail stopped moving. Miller later testified the dog's posture conveyed he was "in odor" and that he could smell narcotics, so Miller allowed the dog to pull himself into the open car window to find the source of the odor. The dog immediately moved to a Chex Mix bag on the floorboard and put his nose in the bag. Miller found what appeared to be baggies of methamphetamine stuffed in a cigarette package inside the Chex Mix bag. He also found drug paraphernalia in the driver's door area. Heaslet then arrested Jones.

Later that night, Stricklin interviewed Jones. Jones admitted that he went to Kansas City to get methamphetamine from a guy named Hector. Jones said he went to get 4 ounces of methamphetamine for Travis Silver, who gave him $2,000, and 2 ounces for Dustin Catrell, who gave him $950. Stricklin responded that they only found 2 ounces, and Jones informed him that the other 4 ounces was in a black toolbox in his car. Jones told Stricklin that in exchange for getting Silver and Catrell methamphetamine, they would give Jones some for his personal use when he delivered it. Jones admitted he had been getting Silver methamphetamine about twice a week for the past month and a half.

A grand jury indicted Jones for cultivating, distributing, or possessing with the intent to distribute over 100 grams of methamphetamine and unlawful use of drug paraphernalia. Jones moved to suppress, arguing generally that the stop exceeded the duration of an investigatory detention for a traffic infraction and it was unreasonably extended by a dog sniff. Jones also moved to disclose the CI's name.

At a hearing on the motions, Stricklin testified about his prior investigation and the actions he took on the day of the car stop. He also testified that the CI was a paid informant. Heaslet testified about conducting the stop. He testified that he directed Miller

3

to conduct the dog sniff because he had reasonable suspicion to believe drugs were in the car based on Jones' behavior, what Jones said, and the information from Stricklin. Heaslet explained that Jones' hands were shaking when he handed over his documents, he had trouble identifying which documents Heaslet asked for, and he had dry mouth and was sweating. Heaslet also stated that when he asked Jones where he was coming from, Jones told him from work in Kansas City, which Heaslet knew was untruthful.

After Heaslet testified, the district court denied Jones' motion to suppress, finding there was reasonable suspicion to extend the stop for the dog sniff and there was probable cause to search the car based on the dog sniff. The district court also denied Jones' motion asking for disclosure of the CI's identity, finding that the CI's information was not the sole basis for the reasonable suspicion to extend the stop.

Jones later filed a motion asking the district court to reconsider its ruling on whether there was probable cause to search the car. The district court held an evidentiary hearing on the motion. Miller testified about his dog's training and how a dog sniff works in general. He testified that his dog is trained to sit when his nose is touching the source of the narcotic odor. Miller stated that when the dog cannot physically touch his nose to the object producing the odor, his body posture and behavior changes—he stays in one area, he deeply inhales, his paw grip changes, his tail stops moving—and thus Miller can still tell the dog has detected the odor of narcotics. This behavior is called being "in odor." Miller testified that when his dog is sniffing the exterior of a car and the car door or window is open, the dog will not enter the space unless he is alerting to an odor, in which case Miller will allow the dog to keep working to find the source.

Miller then testified to conducting the dog sniff on Jones' car. Miller testified that based on the dog's behavior outside Jones' open car window, he believed there was probable cause to search the interior of the car. Miller then allowed the dog to pull himself into the open car window to find the source of the odor. The dog immediately

4

moved to a Chex Mix bag on the floorboard. Miller then searched and found drugs in the Chex Mix bag and drug paraphernalia in the driver's door area.

The district court denied Jones' motion, finding that the dog had alerted outside the car, which provided Miller with probable cause to search inside the car. Alternatively, the court ruled that even if the dog did not alert outside the car, Miller neither encouraged the dog to enter the car nor asked Jones to open the window, so the dog's entry into the car did not violate the Fourth Amendment.

Jones waived his right to a jury trial and proceeded to a bench trial on stipulated evidence. The evidence included a Kansas Bureau of Investigation lab report indicating that the total weight of the methamphetamine seized from Jones was 178 grams. After reviewing the evidence, the district court found Jones guilty of both counts. The district court granted Jones' motion for a durational departure and sentenced him to 122 months' imprisonment. Jones timely appealed the district court's judgment.

REASONABLE SUSPICION TO EXTEND THE TRAFFIC STOP

Jones first claims the district court erred in denying his motion to suppress because it incorrectly found that Heaslet had reasonable suspicion of criminal activity to extend the traffic stop for the dog sniff. The State argues the opposite. Jones properly preserved his challenge by renewing his motion to suppress at the bench trial. See *State v. Dupree*, 304 Kan. 43, 62, 371 P.3d 862 (2016) (stating to preserve a challenge to the denial of a motion to suppress, the party must object to the introduction of the evidence at trial).

When, as here, the facts supporting the district court's decision on a motion to suppress are not disputed, the ultimate question of whether to suppress is a question of law over which the appellate court exercises unlimited review. *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018). Moreover, our Supreme Court has stated that whether

reasonable suspicion exists is a question of law subject to unlimited review by appellate courts. *State v. Jones*, 300 Kan. 630, 642, 333 P.3d 886 (2014).

The Fourth Amendment to the United States Constitution protects people from unlawful seizure and a traffic stop constitutes a seizure of the driver. *State v. Sharp*, 305 Kan. 1076, 1081, 390 P.3d 542 (2017). To comply with the Fourth Amendment, law enforcement must "'have a reasonable and articulable suspicion, based on fact, that the person stopped has committed, is committing, or is about to commit a crime.'" 305 Kan. at 1081. It is a lower standard than probable cause and requires the court to examine the totality of the circumstances from the view of a trained law enforcement officer. 305 Kan. at 1081. Reasonable suspicion is "'a particularized and objective basis' for suspecting the person stopped of criminal activity." *State v. Lowery*, 308 Kan. 359, 366, 420 P.3d 456 (2018).

Jones does not contest the validity of the initial stop for a window tint violation, even though it was pretextual. See *Jones*, 300 Kan. at 638 (noting a traffic stop is not invalid even if it is a "'mere pretext for a narcotics search'"). "During a routine traffic stop, a law enforcement officer may request a driver's license, proof of insurance, and vehicle registration; run a computer check; and issue a citation." *State v. Coleman*, 292 Kan. 813, 816, 257 P.3d 320 (2011). But generally, once the officer determines that the driver has a valid license and the purpose of the traffic stop has ended, the driver must be allowed to leave without further delay. 292 Kan. at 816.

An encounter between a law enforcement officer and a driver can be extended beyond the scope of a routine traffic stop if it becomes consensual and the driver voluntarily agrees to submit to more questioning. *State v. Thompson*, 284 Kan. 763, 775, 166 P.3d 1015 (2007). After Heaslet gave Jones a warning ticket for the window tint violation, he tried to engage Jones in a consensual encounter and asked for permission to search the car, but Jones did not consent to a search. Absent consent, an officer may

6

expand the investigative detention beyond the duration necessary to fulfill the purpose of the initial stop only if there is an objectively reasonable and articulable suspicion that criminal activity was or is taking place. *Jones*, 300 Kan. at 641. Thus, the question is whether Heaslet had a reasonable suspicion that Jones was engaged in other criminal activity which would allow Heaslet to continue to detain Jones and conduct the dog sniff.

The State argues that several factors supported the district court's finding that Heaslet had reasonable suspicion of criminal activity to extend the duration of the traffic stop. As the State argued in district court, Stricklin had received the CI's tip that Jones was travelling to Kansas City that day to pick up methamphetamine for distribution to others, and he confirmed the tip with the GPS tracking devise. Stricklin communicated this information to Heaslet. Also, as Heaslet testified, Jones was nervous during the traffic stop, his hands were shaking when he handed over his documents, he had trouble identifying which documents Heaslet asked for, and he had dry mouth and was sweating. Heaslet also knew that Jones was lying when he said that he was returning from work.

Jones argues the CI tip and his nervous behavior were not sufficient to satisfy the reasonable suspicion standard because there is no indication the CI tip was reliable and nervousness alone is insufficient. Jones cites *State v. Lewis*, 54 Kan. App. 2d 263, 399 P.3d 250 (2017), to support his argument. In *Lewis*, the defendant challenged the district court's finding that reasonable suspicion existed to prolong a traffic stop for a dog sniff based on a CI's tip. The evidence presented at the suppression hearing regarding the CI tip was that (1) the CI heard other people talking about a black male who was selling cocaine out of a pink Cadillac; (2) that multiple people told the officer about the pink Cadillac but when asked the officer could not identify any person who gave him the information; (3) the tip did not get documented; and (4) the officer had seen a pink Cadillac in the area. This court found that the CI tip could not support extending traffic stop because the officer presented no facts on which the reliability of the CI's information could be judged. 54 Kan. App. 2d at 274-77.

7

*Lewis* is not particularly helpful or authoritative in this case. To begin, the *Lewis* court relied on the "three-factor tip test" from *State v. Slater*, 267 Kan. 694, 700, 986 P.2d 1038 (1999), to find that the CI tip was not reliable enough to extend the traffic stop. But in *Slater*, the Kansas Supreme Court discussed how to evaluate a stop based on an *anonymous* tip. 267 Kan. at 700. In contrast, our Supreme Court has noted that tips from known informants are the most reliable kind of tip:

> "'The reliability of the information or the tip given to the police depends upon the type of tip involved. The most favored of the tips are those which are, in fact, not really anonymous at all. These tips occur when the person giving the tip gives the police his or her name and address, or identifies himself or herself in such a way that he or she can be held accountable for the tip.'" *State v. Chapman*, 305 Kan. 365, 373, 381 P.3d 458 (2016) (quoting *Slater*, 267 Kan. 694, Syl. ¶ 4).

Thus, a tip from a known informant, like the one here, already has some indicia of reliability. See *State v. Freel*, 29 Kan. App. 2d 852, 857, 32 P.3d 1219 (2001) ("A tip from a known informant whose reputation can be assessed and who can be held responsible if his or her allegations turn out to be fabricated may exhibit sufficient indicia of reliability to provide reasonable suspicion to make an investigatory stop.").

In any event, *Lewis* is distinguishable from the facts in Jones' case. In *Lewis*, the only information the officer had was the CI's "tip" that a black male was selling cocaine out of a pink Cadillac. Here, other information bolstered the CI's tip that Jones was going to Kansas City on February 13, 2018, to buy methamphetamine. First, Stricklin knew Jones sold methamphetamine because of the prior controlled buys between Jones and the CI. Second, Stricklin saw by GPS that Jones did in fact go to Kansas City as the CI claimed he would. Third, Stricklin knew from prior GPS surveillance that Jones went to the same area two or three times before. In sum, the tip from a known CI already had some indicia of reliability and it was corroborated by independent investigation.

8

Jones also challenges Heaslet's reliance on Jones' nervousness as supporting reasonable suspicion to extend the stop. As Jones correctly points out, nervousness alone should not be given much weight in determining reasonable suspicions. See *Lowery*, 308 Kan. at 367-68 (collecting cases that say same). But Jones fails to acknowledge that the district court seems to have correctly given Jones' nervousness little weight. In its ruling, the district court pointed out that Jones' nervousness could have been because of being stopped by police and being told to put his hands outside the car. Also, as the district court noted, Heaslet relied on more than just Jones' nervousness to establish reasonable suspicion to extend the stop for a dog sniff. The district court also pointed to Jones' sweatiness, his dry mouth, his untruthful answers, and the corroborated CI tip.

In determining whether a reasonable suspicion exists, the court is to consider the totality of the circumstances and it "does not envision a reviewing court pigeonholing each factor as to innocent or suspicious appearances." 308 Kan. at 366. Granted, much of the evidence supporting reasonable suspicion here came from what Heaslet already knew before he stopped Jones' car. But under the facts and circumstances of this case, the district court correctly found Heaslet had a reasonable suspicion to extend the traffic stop. Thus, the district court did not err in denying Jones' motion to suppress on this basis.

PROBABLE CAUSE TO SEARCH THE INTERIOR OF THE CAR

Jones argues the district court also erred in denying his motion to suppress because it incorrectly found that law enforcement had probable cause to search the interior of his car. More specifically, Jones argues the dog never gave an adequate final alert outside his car to establish probable cause for the dog to enter the car. Jones preserved this challenge by renewing his motion to suppress at the bench trial. See *Dupree*, 304 Kan. at 62.

The State counters that Miller testified that the dog does not give a final alert until he has made physical contact with the source and, thus, there would not be a final alert

9

outside the car. The State points out that Miller testified that based on his training and experience, the dog sufficiently revealed outside the car that it detected the odor of narcotics inside the car. Thus, the State argues there was probable cause to search the interior of Jones' car. The State alternatively argues that the dog's entry into the vehicle did not violate Jones' Fourth Amendment rights because Miller did not facilitate the dog's entry, which was spontaneous and instinctual.

As a preliminary matter, the State argues that this court should apply an abuse of discretion standard to this issue because the district court technically considered this issue under a motion to reconsider. The State points out that appellate courts generally treat motions to reconsider as motions to alter or amend. When reviewing the denial of a motion to alter or amend, appellate courts apply an abuse of discretion standard. *Exploration Place, Inc. v. Midwest Drywall Co.*, 277 Kan. 898, 900, 89 P.3d 536 (2004).

As the State correctly points out, the district court heard evidence on this issue on Jones' motion to reconsider. The district court started the hearing by acknowledging that it had found at the original hearing on the motion to suppress that the dog's alert gave law enforcement probable cause to search the vehicle. But the district court also admitted that in making that original ruling it went further than Jones' motion to suppress which only dealt with the extended stop. Even though the district court was ruling on Jones' motion to reconsider, the issue before the court was whether the law enforcement officers had probable cause to search the interior of the car based on the undisputed evidence presented at the hearing. This presents a question of law over which an appellate court has unlimited review. *State v. Fewell*, 286 Kan. 370, 375-76, 184 P.3d 903 (2008).

Under the Fourth Amendment, a warrantless search of a car is permitted if there is probable cause to believe the vehicle contains contraband or evidence of a crime. *State v. Howard*, 305 Kan. 984, 990, 389 P.3d 1280 (2017) (stating the mobility of a car fulfills the requirement of exigent circumstances allowing warrantless search of a car based on

probable cause); *State v. Jefferson*, 297 Kan. 1151, 1159, 310 P.3d 331 (2013) (stating probable cause "'can be established if the totality of the circumstances indicates there is a "fair probability" that the vehicle contains contraband or evidence [of a crime]'"). A dog sniff of the exterior of a car during an otherwise lawful traffic stop is not a search under the Fourth Amendment. *State v. Lutz*, 312 Kan. 358, 366, 474 P.3d 1258 (2020). A dog's alert can establish probable cause if, under the totality of the circumstances, a reasonably prudent person would think that a search would reveal evidence of criminal activity. *Florida v. Harris*, 568 U.S. 237, 248, 133 S. Ct. 1050, 185 L. Ed. 2d 61 (2013).

Here, the district court found that the dog alerted to the odor of narcotics outside the car based on Miller's testimony about the dog's change in behavior. Thus, the district court found there was probable cause for the search once the dog alerted outside the car. Alternatively, the district court found that even if the dog did not alert outside the car, Miller neither encouraged the dog to enter the car nor asked Jones to open the window, so the dog's entry into the car did not violate the Fourth Amendment.

Jones entire argument relies on his assertion that the dog did not give a final alert and, thus, there was not probable cause to search the interior of his car. But as the State correctly points out, Miller testified that the dog is trained to give the final alert, by sitting, only when his nose is touching the source of the narcotic odor. Jones' argument disregards Miller's other testimony, which the district court found persuasive and dispositive. Miller explained that when his dog's nose cannot touch the source of the odor, he can still tell that the dog has detected the odor of narcotics because the dog's body posture and behavior changes—he stays in one area, he deeply inhales, his paw grip changes, and his tail stops moving. This change in behavior shows the dog is "in odor."

Miller testified that the dog here revealed outside the car that he was "in odor," which meant that the dog could smell narcotics inside the car. The dog sufficiently alerted to the odor of drugs while it was still outside the car. Miller then allowed the dog

11

to pull himself into the open car window to find the source of the odor. The dog immediately moved to a Chex Mix bag on the floorboard. Based on this testimony, a reasonably prudent person would think that a search of the interior of Jones' car would reveal narcotics. Thus, the district court did not err in finding the officers had probable cause to search the interior of Jones' car based on the dog's behavior outside the car. We need not address the district court's alternative basis for allowing the search.

## MOTION TO DISCLOSE THE CI'S IDENTITY

Jones next claims the district court erred in denying his motion to disclose the identity of the CI. Jones argues that without the CI's name, he "was unable to test the exactitude and reliability of the information the officers relied upon." The State counters that the CI's involvement in the charged crimes was that of a mere tipster because he simply communicated to Stricklin that Jones was going to Kansas City to pick up methamphetamine on February 13, 2018. The State also points out that Jones fails to argue how the denial of his motion hindered his defense.

Both parties correctly assert that this court reviews the district court's denial of a motion to disclose the identity of a CI for an abuse of discretion. *State v. Thomas*, 252 Kan. 564, 580, 847 P.2d 1219 (1993). A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Ingham*, 308 Kan. 1466, 1469, 430 P.3d 931 (2018). The party asserting an abuse of discretion bears the burden of proving the alleged abuse. *State v. Stafford*, 296 Kan. 25, 45, 290 P.3d 562 (2012).

The identity of a CI is privileged and does not have to be disclosed unless the CI's identity has already been disclosed or it "is essential to assure a fair determination of the issues." K.S.A. 60-436. Thus, the court must determine whether the identity of the CI "'could provide information essential to a fair trial by providing information relevant and

12

helpful to the defense.'" *Thomas*, 252 Kan. at 581. Our Supreme Court has differentiated between a "mere tipster" and an informant who engages in or observes the criminal activity of the defendant. 252 Kan. at 581. The mere tipster simply provides information that precipitates an investigation and his or her identity is not generally subject to disclosure. In contrast, the CI who engages in or observes the defendant's criminal activity can provide independent evidence relevant to the defense. 252 Kan. at 581.

Here, the CI did not participate in or observe the criminal activity that led to the charges against Jones for the events on February 13, 2018. The CI participated in the earlier controlled buys with Jones, but that evidence was used to obtain the GPS warrant. The CI did not participate in any of the activities on February 13, 2018, except to tip Stricklin that Jones was going to Kansas City that day to pick up drugs. Thus, the CI was a mere tipster as to the charges that were ultimately filed against Jones.

More importantly, Jones does not assert how the CI's identity would be relevant to his defense. Jones merely asserts, without further explanation, that he needed the CI's identity to test the reliability of the information provided to the officers. But such a conclusory assertion does not meet his burden. See *Thomas*, 252 Kan. at 581 (stating speculation about what an informant might testify to is not enough to require disclosure); *Freel*, 29 Kan. App. 2d at 855 (finding CI a mere tipster when CI merely called law enforcement with information about the defendant and no evidence suggested that the CI witnessed the crime). And as we have already discussed, the CI's reliability here was corroborated by the information from the GPS tracking devise.

In sum, the CI was a mere tipster and Jones identifies no relevant and material information the CI could provide to his defense. Thus, the district court did not abuse its discretion in denying his motion to disclose the CI's identity.

Finally, Jones claims there was insufficient evidence to support his conviction of distributing methamphetamine. Jones concedes there was ample evidence that he *possessed* methamphetamine with the intent to distribute, but he argues that the State presented no evidence that he transferred or tried to transfer methamphetamine to any person. The State argues that it presented sufficient evidence to show Jones distributed methamphetamine because it offered into evidence Jones' police interview in which he admitted to picking up the methamphetamine from Kansas City for Silver and Catrell. In the alternative, the State argues that the district court found Jones guilty of count I, which included the phrase "possession with the intent to distribute" in the charging document.

> "'When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.'" *State v. Fitzgerald*, 308 Kan. 659, 666, 423 P.3d 497 (2018) (quoting *State v. Lloyd*, 299 Kan. 620, 632, 325 P.3d 1122 [2014]).

Jones was indicted for "unlawfully, feloniously, and intentionally, cultivate, distribute or possess with intent to distribute methamphetamine in an amount weighing over 100 grams" in violation of K.S.A. 2017 Supp. 21-5705(a)(1). That statute makes it "unlawful for any person to distribute or possess with the intent to distribute" certain controlled substances including methamphetamine. See K.S.A. 2020 Supp. 21-5705(a)(1); K.S.A. 65-4107(d). Thus, the State appears to be correct that all it needed to prove at trial was that Jones possessed methamphetamine with the intent to distribute. The journal entry identifies Jones' crime of conviction as "Cultivate, Distribute, Possess with Intent to Distribute Methamphetamine over 100 Grams" in violation of K.S.A. 21-5705(a)(1).

But as Jones points out in his brief, the district court at the bench trial found Jones "guilty beyond a reasonable doubt as to Count I, the distribution of methamphetamine greater than 100 grams." In a criminal case, "[t]he judgment shall be rendered and sentence imposed in open court." K.S.A. 2020 Supp. 22-3424(a). Because the district court found Jones guilty in open court of distributing methamphetamine, we accept Jones' contention that the State needed to provide sufficient evidence of distribution, and not just possession of methamphetamine with intent to distribute, to support the conviction.

"'Distribute' means the *actual, constructive or attempted transfer from one person to another* of some item whether or not there is an agency relationship. [It] includes, but is not limited to, sale, offer for sale or any act that causes some item to be transferred from one person to another." (Emphasis added.) K.S.A. 2020 Supp. 21-5701(d).

Contrary to Jones' assertion, the evidence showed that he transferred or tried to transfer methamphetamine to another person. At the bench trial, the parties stipulated to the admission of various exhibits, including Jones' police interview. In his interview, Jones admitted: (1) he went to Kansas City to pick up 4 ounces of methamphetamine for Silver and 2 ounces of methamphetamine for Catrell; (2) Silver and Catrell gave him money for the methamphetamine; (3) Jones bought the 6 ounces of methamphetamine at a house in Kansas City and was on his way back when Heaslet pulled him over; and (4) in exchange for getting the methamphetamine for Silver and Catrell, they planned to give Jones some for his personal use when he delivered the methamphetamine. Taking the evidence in the light most favorable to the State, Jones admitted he was in the process of transferring methamphetamine to Silver and Catrell when he was stopped. Thus, there was sufficient evidence to support his conviction of distributing methamphetamine.

Affirmed.