NOT DESIGNATED FOR PUBLICATION

No. 113,071

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CHONCEY ALLEN STAMPS,
*Appellant*.


MEMORANDUM OPINION

Appeal from Wyandotte District Court; MICHAEL A. RUSSELL, judge. Opinion filed May 13, 2016. Reversed and remanded with directions.

*Caroline M. Zuschek*, of Kansas Appellate Defender Office, for appellant.

*Alan T. Fogleman*, assistant district attorney, *Jerome A. Gorman*, district attorney, and *Derek Schmidt*, attorney general, for appellee.


Before ARNOLD-BURGER, P.J., GREEN and LEBEN, JJ.


*Per Curiam*:  Choncey Allen Stamps was convicted of interfering with law enforcement, being a felon in possession of a firearm, and possessing cocaine. On appeal, Stamps raises three issues for our consideration: (1) that the trial court erred by allowing inadmissible hearsay into evidence; (2) that the trial court erred by failing to suppress the cocaine evidence seized from his car; and (3) that the trial court erred by failing to find that the State violated the United States Supreme Court's holding in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L. Ed. 2d 215 (1963). As detailed below, the trial court erred by allowing inadmissible hearsay into evidence, by failing to suppress the cocaine

1

evidence seized from his car, and by failing to find that the State committed a *Brady* violation. Accordingly, we reverse Stamps' convictions, remand with directions to suppress the cocaine evidence obtained during the search of Stamps' car, and remand for a new trial.

On July 7, 2013, Leshea Campbell called the police. Campbell reported that Stamps, her children's father, had pointed a gun at her before leaving her house in his white Lincoln with a blue ragtop. Officer Matthew Walterbach responded to the call. Upon arrival at Campbell's house located on Barnett Avenue, Walterbach radioed other police officers in the area about the incident.

Officer Justin Mohney and Officer Abigail Fithian received a call to be on the lookout for a black male in a white Lincoln with a ragtop. While heading towards Campbell's house, Mohney and Fithian saw a white Lincoln with a blue ragtop parked in a parking lot near the intersection of 82nd Street and Minnesota. Fithian, who was driving, turned on the car's emergency lights and pulled up next to the Lincoln. Both officers exited their police car and asked the man in the Lincoln to get out of his car with his hands in the air. The man in the Lincoln complied. Then, the man asked if there was "a problem," looked behind his shoulders, and started running. Neither of the officers were able to catch up with the man. Both officers reported that the man in the Lincoln was a black male wearing red shorts and no shirt.

When Mohney and Fithian returned to the Lincoln, they saw a silver gun on the driver's side floorboard. The officers called the crime scene investigation unit to recover the gun from the car. Other than removing the gun, the officers did not search the car. The officers then had the car towed away.

Later that evening, Stamps called the police to report that his car, a white Lincoln with a blue ragtop, had been stolen. Officer Christopher Blake came to Stamps' house to

2

discuss his stolen car. Stamps told Blake that he had fallen asleep at a family party. Stamps told Blake that when he awoke, he realized that his car was missing. Stamps believed a man named Lance might have stolen his car. After investigating, Blake discovered that the police already had Stamps' car in a tow lot. Blake told Stamps he would have to go to the tow lot the next day to retrieve his car.

The next day, July 8, 2013, Campbell told the police that she had lied about Stamps threatening her with a gun. The police ticketed Campbell for filing a false police report. Meanwhile, Stamps went to the tow lot to retrieve his car. A tow lot employee told Stamps that he could not retrieve his car until he spoke with the police. Stamps immediately called the police to get his car out of the tow lot. Stamps called the police every day. Eventually, the police told Stamps to talk to Detective Stuart Littlefield about getting his car out of the tow lot. When Stamps finally spoke with Littlefield on July 15, 2013, Littlefield requested that the two meet in person to discuss who might have stolen his car.

On July 16, 2013, Stamps went to the police station to speak with Littlefield. Littlefield initially obtained Stamps' consent to search his car. After obtaining his consent, however, Littlefield began interrogating Stamps about whether he was positive he did not threaten Campbell with a gun, whether he owned a gun, and whether he fled from officers near Campbell's house on July 7, 2013. After Littlefield asked for consent to obtain Stamps' DNA, Stamps responded that "this is going further than what's supposed to go" and "I don't want to do none of that." Then, Stamps requested an attorney, and the interrogation ended.

The police immediately arrested Stamps and charged him with criminal possession of a firearm in violation of K.S.A. 2013 Supp. 21-6304(a)(1) and interfering with law enforcement in violation of K.S.A. 2013 Supp. 21-5904(a)(3). Next, Littlefield conducted a search of Stamps' car. During this search, Littlefield found Stamps' wallet, opened it up,

and searched it. This search revealed a bag containing a white powdery substance, which field-tested positive for cocaine. Accordingly, Stamps was additionally charged with possession of cocaine in violation of K.S.A. 2013 Supp. 21-5706(a).

In February 2014, Stamps moved to suppress "the bag of white powder supposedly taken from his wallet." In this motion, Stamps argued that the cocaine should be suppressed because: (1) any consent he may have given was withdrawn; and (2) any consent he may have given did not include consent to search his wallet. Stamps also argued that the cocaine should be suppressed because the police illegally seized his car, holding onto it for 9 days without ever obtaining a warrant, which ultimately tainted any consent he may have given. Stamps asserted that our Supreme Court's decision in *State v. Jefferson*, 297 Kan. 1151, 310 P.3d 331 (2013), was dispositive of this issue.

At the hearing on Stamps' suppression motion, the State called Littlefield to discuss how he had obtained Stamps' consent. Littlefield testified that although he never attempted to get a warrant to search Stamps' car, he believed the search was legal because Stamps gave him general consent. Littlefield additionally testified that he did not believe Stamps revoked his consent because Stamps became upset only after he asked him for consent to obtain his DNA. The trial court ultimately denied Stamps' motion, ruling that Stamps never revoked his consent and Littlefield had not exceeded the scope of Stamps' consent. Moreover, the trial court ruled that our Supreme Court's decision in *Jefferson* was distinguishable from Stamps' case.

In April 2014, Stamps' jury trial was held. The State was unable to serve Campbell with a subpoena to appear at Stamps' trial, thus, she never testified. The first witness the State called was Walterbach. Walterbach testified that on July 7, 2013, he responded to a felony call on Barnett Avenue. Walterbach testified that he radioed to other police officers in the area that the felony suspect "was a black male by the name of Choncey wearing red shorts and no shirt."

4

Stamps' attorney objected and moved for a mistrial, arguing that Walterbach's statement was prejudicial hearsay given that Campbell was not available to testify. The State responded that Walterbach's statement was not hearsay because it showed why Fithian "respond[ed] the way that she [did]." The trial court agreed, overruling Stamps' objection and denying his motion for mistrial.

Next, Mohney and Fithian testified on behalf of the State. Both Mohney and Fithian testified about their interaction with the black male who fled from Stamps' Lincoln. Both Mohney and Fithian testified that they decided to investigate the car after hearing over the police radio that a felony suspect, who was a black male driving a white Lincoln with a ragtop, had just left a house on nearby Barnett Avenue. Fithian also testified: (1) that eventually somebody told her the suspect's name was Choncey, and she was able to identify him by looking at an old photo; (2) that she recognized Stamps as the black male that ran from the Lincoln town car based on his distinct tattoos; and (3) that she had been called to investigate an armed felony disturbance.

Littlefield and two other witnesses testified about the cocaine seized from Stamps' car.

At the beginning of the second day of trial, Stamps' attorney requested a mistrial because he had just learned that the police had charged Campbell with filing a false police report accusing Stamps of assaulting her with a gun. Stamps' attorney asserted that the State's failure to inform him about the charge violated the United States Supreme Court's holding in *Brady*. The State responded that there was no *Brady* violation because whether Campbell had been charged with filing a false police report was irrelevant given that Stamps was not charged with the aggravated assault of Campbell. The trial court agreed and denied Stamps' motion.

Next, Stamps and his mother and father testified on behalf of the defense. Stamps testified that he was at a family gathering all day July 7, 2013. Stamps testified that he got drunk, fell asleep, and discovered his car was missing when he awoke. Stamps' testified that he believed a man named Lance had stolen his car. Stamps' mother and father both corroborated Stamps' testimony, testifying that Stamps spent all day at the family gathering.

During jury deliberations, the jury asked to hear a read-back of Walterbach's testimony twice. Specifically, the jury requested a read-back of the portion of Walterbach's testimony where he stated that he had radioed that the felony suspect went by the name of "Choncey." Stamps' attorney renewed his motion for mistrial. The trial court denied this motion. Although the trial court did not read back the portion of Walterbach's testimony where he mentioned Stamps' name upon the jury's first read-back request, the trial court read back this portion of Walterbach's testimony based upon the jury's second read-back request because the jury indicated that it was hung on two counts and this testimony would help it continue deliberating. Shortly thereafter, the jury found Stamps guilty of all three counts.

Before sentencing, Stamps moved for a new trial because: (1) the State allowed inadmissible hearsay into evidence through Walterbach's testimony; and (2) the State failed to inform the defense of Campbell's false police report charge in violation of *Brady*. The trial court denied Stamps' motion, explaining that it stood by its original rulings.

In total, the trial court sentenced Stamps to a 38-month prison sentence followed by 12 months' postrelease supervision. Stamps timely appealed his convictions and sentences. Additional relevant facts will be discussed in each section below.

*Did the Trial Court Commit Reversible Error by Admitting Walterbach's Hearsay Testimony?*

Stamps argues that the trial court's admission of Walterbach's testimony that he radioed to other police officers that the felony suspect connected to the Barnett address "was a black male by the name of Choncey wearing red shorts and no shirt" was reversible error. First, Stamps argues that this testimony constituted inadmissible hearsay because it tended to prove that he was guilty of being a felon in possession of a firearm, interfering with law enforcement, and possessing cocaine. Second, Stamps argues that the admission of the hearsay constituted reversible error under the constitutional harmless error test. The State counters that the trial court did not err by admitting Walterbach's testimony. Moreover, the State asserts that even if the trial court erred, the error was harmless.

*Standard of Review*

"When an appellate court considers a challenge to the district court's admission of evidence, it must first consider whether the evidence is relevant." *State v. Barney*, 39 Kan. App. 2d 540, 545, 185 P.3d 277 (2007). If the evidence is relevant, then the "'evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question.'" *Barney*, 39 Kan. App. 2d at 545 (quoting *State v. Gunby*, 282 Kan. 39, 47, 144 P.3d 647 [2006]). Still, an appellate court exercises de novo review when an appellant challenges "the adequacy of the legal basis on which the district court decided to admit or exclude evidence." *Barney*, 39 Kan. App. 2d at 545.

If an appellate court determines that the trial court erred in admitting hearsay evidence in violation of the defendant's Sixth Amendment right under the United States Constitution to confront witnesses against him, an appellate court applies the

7

constitutional harmless error test. *State v. Kelley*, 42 Kan. App. 2d 782, 793, 217 P.3d 56 (2009). "Under the federal constitutional harmless error test, an error may not be held to be harmless unless the appellate court is willing to declare a belief that it was harmless beyond a reasonable doubt." *Kelley*, 42 Kan. App. 2d at 793. Thus, an appellate court "must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial." *Kelley*, 42 Kan. App. 2d at 794.

*Applicable Law*

Under K.S.A. 2013 Supp. 60-460, any "[e]vidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible" unless that statement fits within an exception to this general rule. Testimony that is not offered to prove the truth of the matter asserted is not hearsay. *Barney*, 39 Kan. App. 2d at 545.

Our Supreme Court and this court have consistently held that a police officer's testimony regarding secondhand suspect descriptions reported over police radio do not constitute inadmissible hearsay when: (1) the description was limited to what the suspect looked like and where the suspect was located; and (2) the description was admitted to explain why police officers took certain actions. See *State v. Laubach*, 220 Kan. 679, 682-83, 556 P.2d 405 (1976); *State v. Hall*, 220 Kan. 712, 717, 556 P.2d 413 (1976); *State v. Hollaway*, 214 Kan. 636, 638-39, 522 P.2d 364 (1974); *State v. Ritson*, 215 Kan. 742, 748, 529 P.2d 90 (1974); *State v. Trotter*, 203 Kan. 31, 36-37, 453 P.2d 93 (1969); *Barney*, 39 Kan. App. 2d at 547-58. In *Barney*, for instance, the police received an anonymous call that a "'white male, possibly balding, wearing a white tank top and blue [jean] shorts'" was acting suspiciously, peeping in windows, and ringing doorbells in a certain Topeka neighborhood. 39 Kan. App. 2d at 542. Police repeated this information over their radio. *Barney*, 39 Kan. App. 2d at 542. This led to police officers apprehending and arresting Barney for burglary, criminal damage to property, and theft. At Barney's

trial, the arresting police officer repeated what he had heard over the police radio regarding the anonymous tip.

On appeal, Barney argued that this testimony constituted inadmissible hearsay given that he could not confront the anonymous tipster. This court rejected Barney's argument. The *Barney* court held that the testimony was admitted to explain why the police officers reacted when they saw Barney. 39 Kan. App. 2d at 547. The *Barney* court also held that the testimony was admissible because the anonymous caller "merely provided a description of a man who was acting suspiciously in a certain neighborhood" and "did not identify Barney by name and did not establish his guilt of any crime." 39 Kan. App. 2d at 547.

This final distinction is important because when the suspect description at issue identifies the accused and tends to establish the accused's guilt, an officer's testimony regarding the declarant's tip necessarily points to the defendant's guilt; as a result, such testimony constitutes inadmissible hearsay. See *State v. Jamison,* 269 Kan. 564, 570, 7 P.3d 1204 (2000); *State v. Thompson,* 221 Kan. 176, 178-79, 558 P.2d 93 (1976). For example, in *Jamison*, witness testimony that an anonymous tipster called and said the shooter's name was "E-bud" constituted inadmissible hearsay because it identified Jamison, whose gang name was E-bud, as the murderer. 269 Kan. at 570. In *Thompson*, the court affirmed the rule that a police officer may testify as to his conduct or that he received certain information without violating the hearsay rule on the theory that this testimony is not admitted to assert the truth of the matter but only to explain his actions. Nevertheless, where the officer received an anonymous phone call advising that a crime under investigation was committed by a man called "'Crazy John,'" this constituted inadmissible hearsay because it identified "John Thompson" as the robber and established his guilt. 221 Kan. at 178-79.

9

*Additional Facts*

At Stamps' trial, Walterbach testified that after he responded to the Barnett address, he radioed that the suspect "was a black male by the name of Choncey wearing red shorts and no shirt." Stamps' attorney immediately objected and requested a mistrial, asserting that Walterbach's testimony was prejudicial hearsay because Campbell was unavailable to testify.

The State responded that Walterbach's statement was not hearsay because the State was not offering it for the truth of the matter asserted but to show why Fithian "respond[ed]" the way she did. The State argued that Fithian used this knowledge, the fact that the suspect's name was Choncey, to look up Stamps' old photo. Stamps' attorney refuted this argument, emphasizing that the name "'Choncey' [was] completely unnecessary to explain why . . . Fithian would investigate the Lincoln parked on 82nd and Minnesota." Moreover, Stamps' attorney pointed out that he was fairly certain Walterbach never radioed that the felony suspect's name was "Choncey."

The trial court overruled Stamps' objection and motion for mistrial. The trial court explained: (1) that Walterbach's statement did not establish Stamps' guilt in anyway; and (2) that Walterbach's statement showed that "[t]hey were just responding and looking for a black male named Choncey." When the State continued its questioning, Walterbach again stated that he radioed that the felony suspect "was a black male named Choncey wearing red shorts and no shirt."

During Mohney's testimony, Mohney testified that the only information he heard over the police radio regarding the felony suspect was that the felony suspect was a black male in a "white Lincoln town car with a ragtop of some sort." Fithian also testified that the only information she heard over the police radio regarding the felony suspect was that the felony suspect was a black male driving a white Lincoln with a ragtop. Both Mohney

10

and Fithian explicitly testified that they were never told the black male suspect was wearing red shorts and no shirt. During Fithian's testimony, Fithian explained that she identified the black male as Choncey Stamps by looking up an old photo only after someone eventually told her that he was a potential suspect. Moreover, Fithian testified that the black male was suspected of committing an armed felony disturbance.

During jury deliberations, the jury asked the following question: "'First testimony of the first officer regarding why they were called out to the 8524 Barnett or the whole testimony as it wasn't very long. The one that said Choncey's name over the radio.'" Stamps' attorney argued that the jury question bolstered his argument for a mistrial because the jury was clearly focusing on "the totally unnecessary injection of Choncey's name," which "ha[d] poisoned the entire trial." In the alternative, Stamps' attorney requested a curative instruction telling the jury that it could not consider "the mention of Choncey's name as any evidence of guilt in this trial." The State reargued that Walterbach's testimony was not offered for the truth of the matter asserted but to show why Fithian looked up Stamps' old photo.

The trial court agreed with the State, denying Stamps' motions. The trial court explained that because Stamps did not request a curative instruction during trial, it would not give a curative instruction to the jury now. The trial court ultimately decided to grant the jury's read-back request but only to a limited portion of Walterbach's testimony. Specifically, the following testimony was read back to the jury:

"[State]: Did you respond to 8521 Barnett?
"[Walterbach]: Yes, sir.
"[State]: And was that on a felony call?
"[Walterbach]: Yes, sir."

11

After hearing this testimony, the jury resumed deliberations. Then, the jury came back with two more questions. First, the jury asked:

> "'Some of us know what we heard. One of the first officers mention Choncey's name in regards to the radio call on the witness stand. Then there was an objection. Are we allowed to consider the testimony or was it stricken? That's the testimony that we want to hear. Testimony from the police officer who responded to the original armed felony criminal action at 8521 Barnett. Specifically when the name Choncey was mentioned on the radio. What exactly did he say?'"

Second, the jury asked, "'If we have come to a verdict on one count but [are] hung on the other two, what do we do?'"

Again, Stamps' attorney requested a mistrial, reiterating his previous arguments. The trial court denied this request. The trial court decided to ask the jury if the read-back would help them decide the two hung counts. The trial court explained that if the jury answered yes, it would read back Walterbach's testimony regarding the suspect being "a black male by the name of Choncey wearing red shorts and no shirt."

The trial court ultimately asked the jury if a "read-back of Officer Walterbach's testimony, the portion . . . '[s]pecifically when the name Choncey was mentioned on the radio, what exactly did he say?' would [ ] assist [them] further . . . with regard to [their] deliberations?" The presiding juror responded, "Yes." Then, the trial court read back this portion of Walterbach's testimony. Soon after, the jury returned the guilty verdicts on all counts.

*The Trial Court Erred by Admitting Walterbach's Testimony.*

To summarize, in this case, Walterbach testified: (1) that he was investigating a felony call; (2) that the suspect was a black male wearing red shorts and no shirt; and (3)

12

that the suspect went by the name of Choncey. Thus, through Walterbach's testimony, jurors were told that Choncey was suspected of committing some felony offense.

There is no question that Walterbach's testimony was relevant, as it identified Stamps as a suspect in a felony that occurred a little over half a mile from where Mohney and Fithian encountered a black male in Stamps' car. Moreover, there is no question that Walterbach's testimony was based on information that Campbell had told him about Stamps. Yet, the parties dispute whether Walterbach's testimony constituted inadmissible hearsay.

Citing *Jamison*, Stamps argues that Walterbach's testimony constituted inadmissible hearsay because it tended to establish his guilt. On the other hand, the State contends that Walterbach's testimony is distinguishable from the testimony at issue in *Jamison* because Stamps "was being investigated for a felony," *i.e.*, the aggravated assault of Campbell, but Stamps was not on trial for the aggravated assault of Campbell. Instead, Stamps was on trial for being a felon in possession of a firearm, interfering with law enforcement, and possessing cocaine. Moreover, the State argues that Walterbach's testimony was not hearsay because it was not being offered for the truth of the matter asserted. Nevertheless, the State is incorrect.

Jamison *is Indistinguishable.*

In arguing that *Jamison* is distinguishable, the State ignores: (1) that the trial testimony established that Stamps was being investigated for committing an armed felony; and (2) that Stamps was charged with being a felon in possession of a firearm. Although Walterbach never testified as to what felony Stamps was suspected of committing, Fithian testified that she was investigating an armed felony. Consequently, Walterbach's testimony and Fithian's testimony, together, identified "Choncey" as possessing a firearm. Since Stamps' criminal record was not in dispute, Walterbach's

13

testimony and Fithian's testimony identified "Choncey" as a felon in possession of a firearm. Of note, the jury clearly picked up on Fithian's testimony that Stamps was suspected of committing an armed felony because the jury mentioned this in their second read-back request where they asked for "'[t]estimony from the police officer who responded to the original *armed felony* criminal action at 8521 Barnett.'" (Emphasis added.)

Accordingly, the facts of this case are not truly distinct from the facts of *Jamison*. In fact, the ultimate result is the same: a witness' testimony regarding a nontestifying declarant's description of a named suspect tended to prove that the named suspect was guilty as charged.

Furthermore, because Walterbach's statement identified Stamps as the felony suspect, his statement also tended to prove that Stamps was guilty of interfering with law enforcement and possessing cocaine. Just like Walterbach, Mohney and Fithian both testified that the man in the white Lincoln with a ragtop was a black male wearing red shorts and no shirt. As a result, Walterbach's statement that the felony suspect named Choncey was a black male wearing red shorts and no shirt tended to prove that Stamps was the man Mohney and Fithian encountered around the corner from the Barnett address, *i.e*., the man who ran from them, abandoning Stamps' car with cocaine in it. Moreover, the fact that Stamps allegedly committed an armed felony around the corner and the fact that police found a gun in Stamps' car also tend to prove that, in all likelihood, Stamps was the black male who ran from police while abandoning the car with cocaine in it. All in all, Walterbach's statement taken together with Mohney's testimony and Fithian's testimony, reinforced that Stamps was guilty of interfering with law enforcement and possessing cocaine. Accordingly, both the trial court's and the State's argument that Stamps' case is distinguishable from *Jamison* is unpersuasive because Walterbach's testimony tended to prove that Stamps was guilty as charged.

*Walterbach's Testimony Constitutes Hearsay.*

The argument that this court should reject Stamps' hearsay argument because Walterbach's testimony was not offered for the truth of the matter asserted is also unpersuasive. Again, the State asserts that it offered Walterbach's statement for "the sole purpose of [showing] why [the] officers acted the way they did." The State also contends that Walterbach's testimony explains why Fithian knew Stamps' name to look up the old photo. The trial court allowed Walterbach's testimony based on this explanation. Nevertheless, both the trial court's ruling and the State's argument runs counter to reason.

First, unless both Mohney and Fithian were mistaken regarding the felony suspect information they heard over the police radio, it seems Walterbach testified incorrectly about what he radioed. Both Mohney and Fithian testified that the only information they received over police radio was that the suspect was a black male in a white Lincoln with a ragtop. Both testified that outside of the fact that the suspect was a black male driving a white Lincoln, they received no other information about the suspect. Accordingly, there is serious doubt as to whether Walterbach's testimony that he radioed that the felony suspect was a black male wearing red shorts and no shirt named Choncey is even accurate.

Second, given that neither Mohney nor Fithian were familiar with Stamps before this encounter, whether the armed felony suspect's name was Choncey was irrelevant. Obviously, as the officers testified, both decided to investigate the black male in the white Lincoln with a ragtop because he matched the suspect description they had heard over the police radio. Neither officer stopped the black male in the white Lincoln because his name was Choncey.

Moreover, Fithian testified that she looked up Stamps' old photo only after somebody eventually gave her Stamps' name as a potential suspect. Nothing in the record

15

establishes that Walterbach gave her this information. More importantly, according to Fithian, she most certainly did not get this information from Walterbach when he allegedly radioed that the suspect's name was Choncey. The State asserts that "[i]t would have been unbelievable for a jury to hear that the police miraculously pulled up a photo of [Stamps] and identified him." To be fair, the State's assertion ignores two important things: (1) that however Fithian came to know Stamps' name, it was not via Walterbach's alleged radio call; and (2) that a police officer's testimony about a nontestifying declarant's suspect description is inadmissible hearsay if it tends to prove the defendant's guilt.

In summary, Walterbach's statement tended to prove that Stamps was guilty of being a felon in possession of a firearm, interfering with law enforcement, and possessing cocaine. Consequently, the trial court erred by overruling Stamps' objections. As a result, this court must reverse Stamps' convictions and remand unless the trial court committed harmless error.

*The Trial Court's Error Is Reversible Error*

The jury's questions to the trial court clearly proves that the trial court's error was not harmless. To recap, the jury asked for Walterbach's testimony concerning when he "mention[ed] Choncey's name" twice. When the trial court failed to give the jury a read-back of Walterbach's testimony mentioning "Choncey's name" in response to its first question, the jury submitted a second question because "[s]ome of [the jurors] knew what [they had] heard." Along with this second read-back request, the jury asked what it should do if it was hung on two counts. When questioned by the trial court, the presiding juror told the trial court: (1) that the jury was hung on two counts; and (2) that the read-back of Walterbach's testimony when he mentioned Stamps' name on the radio would help them continue their deliberations.

16

Clearly, given the jury's questions, this court cannot "declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial." *Kelley*, 42 Kan. App. 2d at 794. The jury's questions prove that Walterbach's inadmissible hearsay played an incredibly important role in their deliberations. In fact, Walterbach's inadmissible hearsay was so key that the jury indicated that it would be hung on two counts unless it got to hear the testimony again. Thus, if anything, the jury's questions prove beyond a reasonable doubt that the inadmissible hearsay changed the result of the trial.

The State, however, counters that if there was error, the error was harmless for two reasons. First, the State asserts that other evidence proved that Stamps was guilty of being a felon in possession of a firearm, interfering with law enforcement, and possessing cocaine. Specifically, the State hones in on Fithian's identification testimony at Stamps' trial. The State contends that because Fithian testified that she recognized the man who ran from her as Stamps based on his numerous tattoos, the weight of Walterbach's inadmissible hearsay testimony "could not have had an impact on the trial beyond a reasonable doubt."

Obviously, this contention is unfounded. If Walterbach's testimony had such an insignificant influence on the trial, why did the jury request a read-back of this testimony twice? Why did the jury indicate it would be hung on two counts unless it heard his inadmissible hearsay testimony again? We can safely say that if Fithian's identification testimony was so overwhelming, then the jury would not have requested the read-backs.

The State's second argument regarding why the trial court's error was harmless turns on what, if anything, a court may consider regarding jury deliberations. Citing *Yeager v. United States*, 557 U.S. 110, 121, 129 S. Ct. 2360, 174 L. Ed. 2d 78 (2009), the State argues that "[t]his court should not speculate as to what the jurors were trying to decide when asking the questions they asked." Nevertheless, *Yeager* is distinguishable.

17

In *Yeager*, a case which dealt with double jeopardy, the United States Supreme Court explained:

> "Unlike the pleadings, the jury charge, or the evidence introduced by the parties, there is no way to decipher what a hung count represents. Even in the usual sense of 'relevance,' a hung count hardly 'make[s] the existence of any fact . . . more probable or less probable.' Fed. Rule Evid. 401. A host of reasons—sharp disagreement, confusion about the issues, exhaustion after a long trial, to name but a few—could work alone or in tandem to cause a jury to hang. To ascribe meaning to a hung count would presume an ability to identify which factor was at play in the jury room. But that is not reasoned analysis; it is guesswork. Such conjecture about possible reasons for a jury's failure to reach a decision should play no part in assessing the legal consequences of a unanimous verdict that the jurors did return." 557 U.S. at 121-22.

Despite this strongly worded ban against deciphering the inner workings of a jury, *Yeager* is plainly distinguishable from Stamps' case. Unlike *Yeager*, Stamps does not ask this court to decipher the meaning of a jury's hung verdict. See 557 U.S. at 116. In this case, the jury convicted Stamps of all three counts. Thus, Stamps is not asking this court to find meaning behind the jury's hung verdicts. Instead, Stamps simply requests that this court look at the jury's questions to understand the prejudicial effect of Walterbach's testimony. This request does not involve speculation or guesswork because the jury questions are a part of the record. Moreover, the jury's questions convey a simple and easily discernable message: The jury was hung but believed Walterbach's inadmissible hearsay would help them reach a verdict. Accordingly, *Yeager* is distinguishable, and the State's argument fails.

*Conclusion*

Walterbach's testimony that he radioed other police officers that the felony suspect "was a black male by the name of Choncey wearing red shorts and no shirt" was

18

inadmissible hearsay. Because Walterbach's testimony directly incriminated Stamps of being a felon in possession of a firearm, interfering with law enforcement, and possessing cocaine, the testimony was inadmissible. Additionally, given the jury's questions, the error that resulted from the admission of this inadmissible hearsay was not harmless. Consequently, we reverse Stamps' convictions and remand to the trial court for a new trial.

*Did the Trial Court Err by Denying Stamps' Motion to Supress?*

Next, Stamps argues that the trial court erred when it denied his motion to suppress the cocaine evidence seized from his car. Stamps asserts that the police violated his Fourth Amendment right against unreasonable searches and seizures: (1) by illegally seizing his car after they had already removed the gun that was in plain view; and (2) by illegally holding onto his car after Campbell recanted. Stamps further asserts that because the police illegally seized his car, his later consent was tainted by the illegal seizure. Moreover, Stamps argues that even if the police officers legally seized his car, the ultimate search of his car was illegal because: (1) he revoked his consent; and (2) he limited the scope of his consent, and the police exceeded this scope.

The State concedes that Stamps properly preserved his arguments regarding consent. Nonetheless, the State argues that Stamps failed to properly preserve his arguments regarding the illegal seizure of his car. Moreover, the State asserts that Stamps' arguments regarding consent are unfounded because Stamps never revoked his consent and the police never exceeded the scope of his consent. Thus, the State asks this court to affirm the trial court's denial of Stamps' motion to suppress.

19

*Standard of Review*

When reviewing the trial court's decision on a motion to suppress, an appellate court uses a bifurcated standard. *State v. Reiss*, 299 Kan. 291, 296, 326 P.3d 367 (2014). First, an appellate court will review the trial court's factual findings to determine if those findings are supported by substantial competent evidence. Then, an appellate court will review the trial court's ultimate legal conclusion de novo. In conducting this review, an appellate court will "not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact." *Reiss*, 299 Kan. at 296. "'"The State bears the burden to demonstrate that a challenged search or seizure was lawful."'" *Reiss*, 299 Kan. at 296 (quoting *State v. McGinnis*, 290 Kan. 547, 551, 233 P.3d 246 [2010]).

*Applicable Law*

Both the Fourth Amendment to the United States Constitution and Section 15 of the Kansas Constitution Bill of Rights provide protection against unreasonable searches and seizures. Warrantless searches and seizures are unreasonable unless the search or seizure fits within one of the exceptions to the Fourth Amendment warrant requirement. *State v. Jefferson*, 297 Kan. 1151, 1159, 310 P.3d 331 (2013). Two exceptions to the constitutional warrant requirement are consent and probable cause plus exigent circumstances. *State v. Richard*, 300 Kan. 715, 726, 333 P.3d 179 (2014); *Jefferson*, 297 Kan. at 1159. The automobile exception is a subclass of the probable-cause-plus-exigent-circumstances exception, which allows officers to search a car without a warrant "'[i]f a vehicle is readily mobile and probable cause exists to believe the vehicle contains contraband or evidence of a crime.'" *Jefferson*, 297 Kan. at 1159 (quoting *State v. Sanchez–Loredo,* 294 Kan. 50, Syl. ¶ 4, 272 P.3d 34 [2012]).

Probable cause exists when "'the totality of the circumstances indicates there is a "fair probability" that the vehicle contains contraband or evidence [of a crime].'"

20

*Jefferson*, 297 Kan. at 1159 (quoting *Sanchez-Loredo,* 294 Kan. at 55). If probable cause exists at the scene, then police officers have probable cause to seize the car and search it at a later time. *Jefferson*, 297 Kan. at 1159.

Under the exclusionary rule, if the State fails to establish the lawfulness of a search or seizure, then all the evidence obtained through the illegal search or seizure may be suppressed. *Jefferson*, 297 Kan. at 1161. "The fruit of the poisonous tree doctrine is 'one facet of the exclusionary rule' and 'extend[s] the scope of the exclusionary rule to bar' admission of evidence directly or indirectly obtained as a result of unlawful police conduct." *Jefferson*, 297 Kan. at 1161-62 (quoting *State v. Deffenbaugh*, 216 Kan. 593, 598, 533 P.2d 1328 [1975]). The State bears the burden to establish that the unlawfully seized evidence is admissible under an exception to the exclusionary rule. See *Jefferson*, 297 Kan. at 1162.

*Additional Facts*

When Stamps finally got in contact with Littlefield so he could retrieve his car, Littlefield asked Stamps to come down to the police station so they could discuss who stole his car. On July 16, 2013, at 8:30 a.m., Stamps went to the police station and spoke with Littlefield. During the interrogation, Littlefield told Stamps that he had spoken with Campbell the day before, and she had told him that she lied about the aggravated assault. Then, Littlefield *Mirandized* Stamps. Stamps told Littlefield that his car was stolen, possibly by a man named Lance, while he was attending a party at his father's house. Stamps told Littlefield that his wallet and watch were still in his car. Then, the following exchange occurred:

> "[Littlefield]: Okay is there any chance, I mean I'm worried that they might have left some *contraband in your car*, do you have a problem with us going down and looking thorough it *with you*?

"[Stamps]: That's fine.

"[Littlefield]: Okay this is a consent to search, I am going to read this to you. I Choncey Stamps at this time give permission to the Police Officers of the Kansas City, Kansas Police Department to conduct a search of, and this is your *Lincoln Town Car*, here's the tag 715 Frank, Frank David, I put the VIN, it's a 94 right?

"[Stamps]: Yeah.

"[Littlefield]: Um, and it says here, I understand that I have the right of refusing consent to search of the previously described property or location, I also have the right to refuse to sign this document, I furthermore declare that I have not been forced, promised, nor threatened previously to sign this document. It means that we can look at it at your own free will, *recover anything that's contraband, anything that belongs to you obviously we'll give back to you.* I now give my authorization that the police officers present take from this property any article of proof of any infraction of the law and the time is 0841 hours and if you could sign that right there, just use that pen right there.

"[Stamps]: I hope . . .

"[Littlefield]: The last time you saw [Campbell] was the 23rd?

"[Stamps]: Yeah." (Emphasis added.)

It seems Stamps signed the consent form immediately after Littlefield stated, "just use that pen right there," because the consent form states that it was signed at "0841 [hours]." After signing the consent form, Littlefield continued to question Stamps about his relationship with Campbell. Next, Littlefield started questioning Stamps about whether he was positive he did not threaten Campbell with a gun, whether he owns a gun, and whether he fled from police officers near Campbell's house on July 7, 2013. Littlefield asked Stamps if his DNA would be on the gun. Stamps responded that it would not be on the gun. Then, the following exchange occurred:

"[Littlefield]: Do you mind, because we are going to DNA that gun, do you mind us collecting your DNA to compare?

"[Stamps]: That's fine, that's fine.

"[Littlefield]: I am going to get the consent out again. I'll get, if you don't mind we'll collect your DNA, you're sure you never touched that gun?

22

. . . .

"[Littlefield]: You're DNA won't ever be on it?

"[Stamps]: No, never, nowhere.

"[Littlefield]: You didn't run from the police?

"[Stamps]: No, no I have no reason to run from the police, I have no warrants.

"[Littlefield]: Okay this your consent again, okay and I'm going to read this to you because we will collect your DNA, just a mouth swab. I Choncey Stamps at this time give permission to the Police Officer of the Kansas City, Kansas Police Department to conduct a search of, and one side we've written your Lincoln.

"[Stamps]: Uh-huh.

"[Littlefield]: Because we are going to go through that and the other side I'm going to write DNA, the same form, and it says I understand that I have the right of refusing to the search of previously described property or location and I have the right to refuse . . .

"[Stamps]: Well why do I have to do *all that*.

"[Littlefield]: Well . . .

"[Stamps]: See now this is going *further than what's supposed to go* . . .

"[Littlefield]: I know . . .

"[Stamps]: I would rather have a lawyer [] present.

"[Littlefield]: Oh you want a lawyer?

"[Stamps]: Yes sir.

"[Littlefield]: Okay that's not a problem.

"[Stamps]: Before I . . .

"[Littlefield]: (inaudible) sign it.

"[Stamps]: Yeah.

"[Littlefield]: So I am going to cross out DNA he would rather talk to his lawyer?

"[Stamps]: Yeah because this is going further then . . .

"[Littlefield]: I understand.

"[Stamps]: Yeah.

"[Littlefield]: You actually have the right to an attorney?

"[Stamps]: Yeah I don't want to do *none of that*.

"[Littlefield]: That's not a problem.

"[Stamps]: Yeah.

"[Littlefield]: So we won't ask you no more questions.

23

"[Stamps]: Because this is going further [than] my car being stolen.

"[Littlefield]: Okay[,] no you're right.

"[Stamps]: I don't want to get involved in *all that*.

"[Littlefield]: Okay[,] give me a second here, give me five minute[s][.] I'm going to go talk to my Captain.

"[Stamps]: All right." (Emphasis added.)

At this point, the interrogation ended, and Stamps was arrested.

Next, Littlefield conducted a search of Stamps' car outside of Stamps' presence. During this search, Littlefield found a wallet inside the "cubbyhole" underneath the driver's side armrest. Littlefield opened up the wallet, found Stamps' driver's license, and also found a bag containing cocaine.

When Stamps' moved to suppress the cocaine evidence seized from his car, Stamps argued: (1) any consent he may have given was withdrawn; and (2) any consent he may have given did not include consent to search his wallet. Moreover, Stamps argued that the police illegally detained his car 9 days without probable cause because there was not a fair probability that anything left inside the car would help prove that he was guilty of assault, criminal possession of a firearm, or interference with law enforcement. Citing our Supreme Court's decision in *Jefferson*, Stamps asserted that this illegal seizure tainted any consent he may have later given.

At the motion hearing, Littlefield's testimony revealed: (1) that he never attempted to get a warrant to search Stamps' car; (2) that he waited to talk to Stamps until after he spoke to Campbell; (3) that when he spoke with Stamps over the phone, he told Stamps something along the lines of, "'[L]et me talk to you and we'll get you your car back'"; (4) that he thought he had Stamps' consent to search his car; and (5) that he was hoping to find ammunition, a holster, or a gun receipt when he searched the car.

24

The trial court denied Stamps' motion to suppress, ruling:

"[T]he Court finds first that the defendant did not revoke his consent to search . . . this vehicle. Moreover, the Court finds under a totality of circumstances that the defendant's consent to search was voluntarily, intelligently, and freely given. There's no evidence that he was coerced or threatened in this case. . . . He was informed of his rights, as shown through his statement that was admitted, including his right to refuse. In what he was read to by the detective, the detective specifically said that they would recover anything that was contraband and anything that belonged to the defendant because they would return it to him. So it was clear that the scope of the search was not only going to be for contraband, but it was also going to be anything that belonged to the defendant.

"... Moreover, under Kansas Law, police have the right to search, including—a right to search under consent includes any personal effects. In this case it would make sense that when they found his wallet, given that the defendant had claimed that persons had stolen his vehicle, that they were going to check his wallet to determine if it belonged to either the defendant or it belonged to the persons who allegedly stole his vehicle, according to the defendant."

The trial court further ruled that *Jefferson* was distinguishable because: (1) the police in *Jefferson* "had no probable cause to seize [the car] in the first place"; and (2) the police in *Jefferson* left a note that his car would not be returned unless he was interviewed. The trial court explained that in Stamps' case, his car was lawfully seized because Stamps had "reported [it] stolen and it was recovered."

*Stamps Revoked His Consent.*

Stamps concedes that he initially gave Littlefield consent to search his car. Nevertheless, Stamps argues that he revoked his consent when he told Littlefield that the interrogation was going further than he thought it would and that he did not "want to do *none* of that." In denying Stamps' motion to suppress, the trial court explained that Stamps denied consent to search his DNA alone because Stamps brought up that he had

an issue with giving his consent only when Littlefield "asked [him] to sign a consent to search for his DNA." Nevertheless, the police interrogation transcript reveals that the trial court erred.

*The Context of Stamps' Statements and Plain Meaning of Stamps' Word Choice Proves He Revoked His Consent.*

After Stamps signed the consent form, Littlefield put the consent form away. This is evidenced by Littlefield's statement that he would get Stamps' "consent out again" when he started asking Stamps for his DNA. Then, Littlefield wrote "DNA" on the consent form Stamps had already signed. After Littlefield amended the form, Stamps made the following statements:

- "Well why do I have to do *all* that[?]"
- "[T]his is going further than what's [*sic*] supposed to go."
- "Yeah I don't want to do *none* of that."
- "I don't want to get involved in *all* that." (Emphasis added.)

Then, Littlefield honored Stamps request for an attorney and crossed out the word DNA on the consent form.

This sequence of events shows that Stamps revoked his consent. First, the context of Stamps' statements proves that he was revoking his consent to search his car. When Stamps stated he did not want to do "all that" or "none of that," Stamps was not looking at a consent form specifically for DNA. Instead, Stamps made those statements while looking at the single consent form, which included the consent to search his car and the consent to obtain his DNA. This means that his comments were not limited specifically to Littlefield's request for DNA as the trial court found.

26

Looking at Stamps' statements in context, it is readily apparent that Stamps eventually realized that Littlefield was not simply investigating the theft of his car but investigating him for aggravated assault, felon in possession of a firearm, and interfering with law enforcement. Once he made this realization, he decided that he was not going to consent to anything and wanted to speak with an attorney. Given this context, the trial court's finding that Stamps' merely told Littlefield he refused to consent to DNA testing is unreasonable.

Second, Stamps' word choice further proves that he revoked his consent in its entirety. During the interview, Stamps never told Littlefield, "I don't want you to take my DNA." Instead, Stamps stated that he did not want to "do *none* of that" or "get involved in *all* that." (Emphasis added.) The word "none" means "[n]o part: not any." Webster's II New Riverside University Dictionary 800 (1988). Thus, when Stamps told Littlefield that he did not want to "do none of that," Stamps meant that he no longer wanted to do any of the things listed on the consent form. The word "all" means "[t]he total entirety or extent of." Webster's II New Riverside University Dictionary 93 (1988). Thus, when Stamps told Littlefield that he did not want to "get involved in all that," he meant that he no longer wanted to consent to the total entirety of the search. Given Stamps' word choice, it was unreasonable for the trial court to conclude that Stamps' statements were limited to the DNA consent only.

*The State's Arguments Why Stamps Never Revoked His Consent Are Baseless.*

Despite the preceding evidence to the contrary, the State asserts that Stamps never revoked his consent. The State explains that because Stamps asked Littlefield about whether he found his watch in his car about a week after the interview, Stamps must have given his consent. The State also argues that this court must affirm the trial court given that this court cannot "reweigh evidence or resolve conflicts in questions of fact." Yet, both arguments are baseless.

27

First, it should be noted that the only evidence supporting that Stamps inquired about his watch is Littlefield's testimony at the motion hearing. More importantly, however, the State's argument is flawed. Even if Stamps inquired about his watch, his inquiry does not mean Stamps never revoked his consent. The State's argument is the logical fallacy of affirming the consequent, which can be broken down in the following syllogism: (1) If a person consented to the search, then that person knows about the search being conducted; (2) Stamps knew about the search being conducted; (3) Therefore, Stamps consented to the search. Clearly, the conclusion that Stamps consented to the search is repugnant to reason because consenting to a search is not the only reason why a person might know about a search being conducted. In this case, there are an infinite number of reasons why Stamps knew about Littlefield's search.

Regarding the State's argument about reweighing evidence and redetermining questions of fact, although the State correctly asserts that this court cannot reweigh evidence or redetermine questions of facts, this does not mean that this court is bound to accept a trial court's unreasonable factual findings. When reviewing motions to suppress, this court must determine if the trial court's factual findings are supported by substantial competent evidence. "'Substantial competent evidence is legal and relevant evidence a reasonable person could accept to support a conclusion.'" *State v. Talkington*, 301 Kan. 453, 461, 345 P.3d 258 (2015) (quoting *State v. Bird,* 298 Kan. 393, 399, 312 P.3d 1265 [2013]). Therefore, if the trial court reaches a conclusion that a reasonable person could not accept, this court is not bound by the trial court's ruling simply because this court does not reweigh evidence or redetermine questions of facts. Moreover, as previously detailed, the trial court's factual findings were inconsistent.

To conclude, the trial court's interpretation of the facts regarding Stamps' alleged consent were unreasonable given both the context of Stamps' statements and the plain meaning of Stamps' word choice. Because Stamps' statements prove that he revoked his consent, the trial court's finding is not supported by substantial competent evidence.

28

Moreover, it is important to note that the State never argues that one of the exceptions to the exclusionary rule saves the cocaine evidence seized from Stamps' car. Accordingly, if the State had any such argument, it has abandoned it by failing to raise it on appeal. *State v. Boleyn*, 297 Kan. 610, 633, 303 P.3d 680 (2013) (holding an issue not briefed is abandoned). Because we determine that Stamps revoked his consent when he declared to Littlefield—"I don't want to do none of that"—the trial court erred by failing to suppress the cocaine evidence seized from Stamps' car.

*Even If Stamps Had Not Revoked His Consent, Littlefield's Search Exceeded the Scope of His Consent.*

Next, Stamps asserts that assuming arguendo there was no revocation, the trial court still erred by failing to suppress the cocaine evidence because Littlefield exceeded the scope of his consent. In his brief, Stamps argues that he limited the scope of his consent in three ways. First, Stamps argues that his consent was limited to the search of his car alone. Second, Stamps argues that his consent was limited to the search for contraband left by the person who stole his car. Third, Stamps argues that his consent was limited to a search that was to be conducted in his presence. Stamps argues that Littlefield violated his Fourth Amendment rights by failing to comply with these limitations.

To review, in denying Stamps' motion to suppress, the trial court found that Littlefield did not exceed the scope of Stamps' consent because: (1) Stamps gave a general consent to the search of his car that included both contraband and his personal items; and (2) Stamps is not entitled to relief under Kansas aw, which allows police to search any "personal effects" after they have obtained consent. On appeal, the State requests that this court affirm the trial court's ruling based upon these same arguments, *i.e.*, Stamps gave Littlefield general consent to search his car and Stamps is not entitled to relief under Kansas law.

29

*Stamps Did Not Give a General Consent.*

First, the trial court erred by finding that Stamps gave a general consent to the search of his car. "'[A] suspect may of course delimit as he chooses the scope of the search to which he consents.'" *State v. Ryce*, 303 Kan. 899, 2016 WL 756686, at *22 (February 26, 2016) (quoting *Florida v. Jimeno,* 500 U.S. 248, 252, 111 S. Ct. 1801, 114 L. Ed. 2d 297 [1991]) (mandate not yet issued). To determine the scope of a defendant's consent, a court must determine what a reasonable person would have understood by the exchange between the police officer and the defendant. *State v. Richmond*, 30 Kan. App. 2d 1008, 1012, 52 P.3d 915 (2002). A general consent is broad and open-ended. For example, in *State v. Moore*, 283 Kan. 344, Syl. ¶ 11, 347, 154 P.3d 1 (2007), our Supreme Court held that Moore gave a police officer general consent to search his car when he told the police officer he "could look wherever he wanted."

In this case, Littlefield made the following oral promises to Stamps: (1) that the search would be of the car alone; (2) that the search would be solely for contraband connected to the theft of Stamps' car; (3) that the police would return anything that belonged to him, including his wallet and his watch; and (4) that the police search would be conducted in his presence. Obviously, a consent containing these qualifications is far narrower than a consent allowing an officer to "look wherever he wanted." Each promise Littlefield made narrowed the scope of what the police could search for and how the search was to be conducted. Thus, Stamps' consent was not a general consent.

Moreover, the trial court's finding that Stamps gave a general consent is particularly problematic because courts must take care to narrowly construe a defendant's consent in cases where a defendant's consent is obtained by a ruse. See *State v. Johnson*, 253 Kan. 356, 365, 856 P.2d 134 (1993). In *Johnson*, for example, our Supreme Court held that if a police officer has a reasonable basis to suspect criminal activity, that police officer may use a ruse to obtain consent to conduct a search. Nevertheless, when a ruse is

used, the defendant's permission to conduct a search must "be construed narrowly." *Johnson*, 253 Kan. at 365.

Here, Stamps' consent was clearly obtained by use of a ruse given: (1) that Littlefield needed to talk to Stamps before Stamps could retrieve his car; (2) that Littlefield's primary purpose for conducting the interrogation and obtaining Stamps' consent was to see if he could tie Stamps to the crimes that would later be filed against Stamps; and (3) that Littlefield explicitly testified that he never believed somebody stole Stamps' car. Most importantly, when Littlefield obtained Stamps' consent, he did so by leading Stamps to believe that he was worried that the people who had stolen his car "might have left some contraband in [his] car." Littlefield used this ruse to reassure Stamps that he was not in trouble and that police would only be looking for contraband while Stamps oversaw the search. In turn, however, this narrowed or limited the scope of Stamps' consent to illegal contraband left in his car. Consequently, we reject the trial court's finding that Stamps gave a general consent to search his car given that a defendant's consent must "be construed narrowly" when the consent is obtained by a ruse.

*Consent Does Not Give Police Unlimited Power to Search Personal Effects*

Second, the trial court incorrectly held that Kansas law gave police unlimited power to search "personal effects" after obtaining consent. As the State points out in its brief, when an officer has obtained general consent to search a car, that officer may "search *all readily opened* containers and compartments within the vehicle." *Moore*, 283 Kan. 344, Syl. ¶ 11. (Emphasis added.) This does not mean that the police can tear a car apart searching for evidence. See *Moore*, 283 Kan. at 361-62. Furthermore, when a defendant's consent is somehow limited, police must conduct their search within the limited scope of the defendant's consent. For example, in *State v. Richmond*, 30 Kan. App. 2d 1008, 1012, 52 P.3d 915 (2002), the police violated Richmond's Fourth Amendment rights when it searched her purse against the "expressly and narrowly

31

limited [] scope of her consent to search." Thus, the trial court's generalized ruling that Kansas law allows police to search personal effects after obtaining consent is too broad an interpretation of Kansas law.

*Littlefield Exceeded the Scope of Stamps' Consent.*

Third, in this case, Littlefield clearly exceeded the scope of Stamps' limited consent to search his car. A search conducted under consent may not exceed the scope of the consent sought and given. See *Jimeno*, 500 U.S. at 251-52. A police officer violates a defendant's Fourth Amendment rights if the officer exceeds the scope of his or her invitation obtained by use of a ruse because that officer is conducting the search without probable cause or a warrant. See *Johnson*, 253 Kan. at 367 (quoting *United States v. Scherer,* 673 F.2d 176, 182 [7th Cir.], *cert. denied* 457 U.S. 1120 [1982]) (noting that an important factor supporting that the police conducted a reasonable search within the confines of Johnson's consent obtained by a ruse was because "[t]he officers did not exceed the scope of the search"). In addition, a federal court has held that in order to admit evidence based on consent, the trial court must consider from the totality of the circumstances that (1) the consent was voluntary and (2) the search did not exceed the scope of the consent. *United States v. Price*, 925 F.2d 1268, 1270 (10th Cir. 1991).

Here, as previously discussed, Stamps' gave Littlefield consent to search his car for the limited purpose of finding illegal contraband connected with the theft of his car while he was physically present. Nevertheless, during the search, Littlefield combed not only through Stamps' car, but also through Stamps' wallet. Littlefield knew that Stamps' wallet would be in the car because Stamps told Littlefield that is where he had left it. Therefore, Littlefield should have known that he could not search the wallet because it was not illegal contraband connected to the theft of Stamps' car. At the very least, Littlefield should not have continued to search Stamps' wallet once he found Stamps' driver's license. Furthermore, Stamps was not present during the search even though

32

Littlefield told Stamps that he would look through the car "with [him]." If Stamps had been present during the search as Littlefield promised, Stamps would have been able to tell Littlefield that was his wallet and not illegal contraband connected with the theft of his car before Littlefield had the opportunity to search the wallet. As a result, Littlefield exceeded the limited scope of Stamps' consent.

Because Littlefield's search of Stamps' car was wholly unrelated to the expressed object of the search—illegal contraband connected with the theft of Stamps' car—the cocaine evidence retrieved from Stamps' wallet must be suppressed. Moreover, even if Stamps never revoked his consent, the cocaine evidence seized from his car must be suppressed because Littlefield violated his Fourth Amendment rights by exceeding the scope of his limited consent. Because we have determined that Stamps had revoked his consent or, in the alternative, the search exceeded the scope of Stamps' limited consent, it is not necessary that we address Stamps' contention that the police used the illegal seizure of his car to coerce him into consenting.

*Did the Trial Court Err When It Rejected Stamps'* Brady *Violation Argument?*

Finally, Stamps argues that the State committed a *Brady* violation when it failed to disclose that Campbell had been charged with filing a false police report. Accordingly, Stamps argues that the trial court erred when it rejected his *Brady* violation argument while denying his motion for mistrial and motion for new trial. The State counters that it did not commit a *Brady* violation. Moreover, the State asserts that even if it erred by failing to turn over this evidence, Stamps is not entitled to relief because he has failed to establish that he was prejudiced by this error.

*Standard of Review*

While deferring to the trial court's factual findings, an appellate court reviews a trial court's ruling on a *Brady* violation de novo. *State v. Warrior*, 294 Kan. 484, 510, 277 P.3d 1111 (2012). An appellate court reviews a trial court's ruling on a motion for mistrial and a motion for new trial for an abuse of discretion. See *State v. Soto*, 301 Kan. 969, 977, 349 P.3d 1256 (2015); *Warrior*, 294 Kan. at 505, 510. A trial court abuses its discretion when an action is "'(1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact.'" *Soto*, 301 Kan. at 977 (quoting *State v. Clay,* 300 Kan. 401, 414, 329 P.3d 484 [2014]).

*Applicable Law*

When a prosecutor suppresses evidence favorable to the accused, that prosecutor violates a defendant's due process rights under the Fourteenth Amendment to the United States Constitution. *Soto*, 301 Kan. at 978. "The three components of a *Brady* violation claim are: '(1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material so as to establish prejudice.'" *Soto*, 301 Kan. at 978.

"Under the first prong, '[e]vidence that is favorable to the accused encompasses both exculpatory and impeachment evidence.'" *Soto*, 301 Kan. at 978. Under the third prong, "'evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Soto*, 301 Kan. at 980 (quoting *Warrior,* 294 Kan. 484, Syl. ¶ 11). Accordingly, under the third prong, defendants need not show that they would have been acquitted but for the *Brady* violation. Instead, defendants merely need to show that "''the

34

favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." [Citation omitted.]'" *Warrior*, 294 Kan. at 508 (quoting *Youngblood v. West Virginia,* 547 U.S. 867, 870, 126 S. Ct. 2188, 165 L. Ed. 2d 269 [2006]).

*Additional Facts*

At the beginning of the second day of trial, Stamps' attorney requested a mistrial because he had just learned that the police had ticketed Campbell for filing a false police report for lying about Stamps assaulting her with a gun. Stamps' attorney argued that this constituted *Brady* material. To support his argument, Stamps' attorney brought documents showing that Campbell had been ticketed for filing a false police report on July 8, 2013. Stamps' attorney brought in another document showing that Campbell's case was settled as part of a plea agreement, where Campbell's false police report charge was dismissed in exchange for her guilty plea on two traffic offenses. The trial court denied Stamps' motion for mistrial because: (1) Campbell was not convicted of filing a false police report given that the charge was dismissed; and (2) Campbell was not testifying in this case, meaning Campbell's charge would be irrelevant for impeachment purposes.

As part of his motion for new trial, Stamps reiterated his arguments concerning the State's alleged *Brady* violation. To support this argument, Stamps called Campbell as a witness. Campbell testified that she lied about Stamps assaulting her and was found guilty of filing a false police report and two traffic violations. The trial court denied Stamps' motion, ruling: (1) that the evidence of Campbell's charge was irrelevant given that Campbell did not testify; and (2) that the evidence of Campbell's charge did not constitute *Brady* material.

35

*The Trial Court Erred by Denying Stamps' Motions Because the State Committed a* Brady *Violation.*

The State concedes that if Campbell's charge constituted *Brady* material, it failed to turn over this material before trial. Consequently, the parties' dispute turns on whether this evidence was favorable under the first prong of the *Brady* violation test and whether this evidence was so material as to prejudice Stamps under the third prong of the *Brady* violation test. As detailed below, Stamps meets his burden under both prongs of the test.

*The Evidence Was Favorable.*

The evidence of Campbell's charge was clearly favorable. As Stamps points out in his brief, he could have used this evidence to impeach Walterbach's testimony and Fithian's testimony regarding their investigation of the felony suspect. By impeaching the officers, Stamps would have been able to establish that the whole reason the police began investigating him was based on Campbell's false report that he assaulted her with a gun. Moreover, as Stamps points out in his brief, this evidence was highly exculpatory because it helped corroborate his alibi and weaken his connection to the gun found in the car.

It is important to note that the difference between simply knowing Campbell recanted and knowing that the police charged Campbell with filing a false police report is a major one. The fact that police charged Campbell with filing a false police report implies that the State recognized that Campbell lied. It implies that the State believed Campbell was not simply recanting to protect Stamps but actually made the whole story up. Because the State charged Campbell with filing a false police report, at trial, the State would be bound by this charge. That is, the State could not argue that Campbell recanted to protect Stamps unless it was willing to also divulge that it charged Campbell with a

36

crime it did not believe she was guilty of committing. In summary, if Stamps had known about this information, it could have been incredibly beneficial to his defense.

Nevertheless, the State attacks Stamps' arguments regarding the favorability of this evidence. The State argues that the evidence of Campbell's charge was not favorable because it was unusable at trial. Citing K.S.A. 60-447, K.S.A. 60-420, K.S.A. 60-421, and K.S.A. 60-422, the State contends: (1) because Campbell was never convicted of filing a false police report since the charge was dismissed as part of a plea deal, Stamps would not have been able to get this evidence into trial given that "[s]pecific instances of conduct tending to prove a trait bad, for example truthfulness, can only be proved by evidence of a criminal conviction"; and (2) because Campbell never testified at trial, Stamps would never be able to get in evidence of her charge. The State additionally argues that evidence of Campbell's charge was not favorable because her charge "had no bearing" on whether Stamps was guilty of interfering with a police officer, being a felon in possession of a firearm, or possessing cocaine. There are several problems with the State's arguments, however.

First, the fact that Campbell was never convicted does not mean that Stamps could not get this evidence in at trial. Under K.S.A. 60-420 and K.S.A. 60-422, for example, a party may examine a witness and bring up extrinsic evidence on a relevant matter concerning that witness' credibility. Neither provision requires that the witness be convicted of a crime involving dishonesty before a party can attack that witness' credibility. As a result, Stamps could have raised the fact that Campbell was charged with filing a false police report through these provisions.

Moreover, K.S.A. 60-447 and K.S.A. 60-421 do not prevent a party from attacking a witness' credibility just because that witness was never convicted of a crime involving dishonesty. K.S.A. 60-447 involves what evidence a party may use when the party is attempting to use a witness' character trait as proof of conduct. K.S.A. 60-421 simply

prevents a party from using a witness' prior convictions unrelated to dishonesty or false statements for the purpose of attacking that witness' credibility. Consequently, the State has misinterpreted the Kansas rules of evidence in making this argument.

Second, although Campbell never testified, this does not mean that her statements were not admitted into evidence. The State seems to ignore that even though Campbell never testified, her statements came in through Walterbach's testimony and Fithian's testimony. Again, between the two officers' testimonies, the jury heard that Stamps was suspected of committing an armed felony which occurred around the corner from the place where the black male in Stamps' car was found minutes later. Clearly, whatever information Walterbach knew about the felony suspect, he learned it from Campbell.

Third, because Campbell's statements were admitted into evidence, fairness required that Stamps could respond to the accuracy of those statements. As detailed in the section on hearsay, the trial court erred by allowing Walterbach's hearsay testimony. The trial court erroneously ruled that Walterbach's testimony was not hearsay because it was not offered for the truth of the matter asserted. If the trial court had ruled correctly, this evidence would never have been before the jury.

Since it was put before the jury, however, Stamps should have been able to respond by putting forth evidence of Campbell's false police report charge. K.S.A. 60-462 supports this conclusion. K.S.A. 60-462 states:

> "Evidence of a statement or other conduct by a declarant inconsistent with a statement received in evidence under an exception to K.S.A. 60-460, is admissible for the purpose of discrediting the declarant, though he or she had no opportunity to deny or explain such inconsistent statement. Any other evidence tending to impair or support the credibility of the declarant is admissible if it would have been admissible had the declarant been a witness."

Thus, K.S.A. 60-462 recognizes that fairness requires that a party should have some way to attack the credibility of a nontestifying declarant's statement. As a result, the State's argument that Stamps was banned from raising evidence of Campbell's charge because Campbell never testified only emphasizes that the trial court's erroneous rulings resulted in a fundamentally unfair trial. Moreover, hypothetically speaking, if Walterbach's hearsay testimony was properly admitted into evidence, it would have been properly admitted under one of the K.S.A 2013 Supp. 60-460 hearsay exceptions. If that were the case, then Stamps would have had the opportunity to discredit Walterbach's testimony under K.S.A. 60-462.

Fourth, the State's assertion that Campbell's false police report charge "had no bearing as to [Stamps'] guilt" is absolutely incorrect. If Campbell had not called the police, the police would not have been on the lookout for the black male in the white Lincoln with a blue ragtop. As discussed in the section on hearsay, the fact that Campbell accused Stamps of assaulting her with a gun tends to prove that he was guilty of being a felon in possession of a firearm. Additionally, the fact that a man matching Stamps' description in Stamps' car turns up around the corner from Campbell's address shortly after she called the police tends to prove that Stamps was the person who interfered with law enforcement by fleeing from the police and was the person who abandoned the cocaine in his car. Thus, the veracity of Campbell's accusation was vitally important in proving Stamps' guilt. Accordingly, the State's argument that Campbell's charge had no bearing on Stamps' guilt is repugnant to reason.

To conclude, the evidence of Campbell's false police report charge was favorable. As a result, Stamps has met his burden under the first prong to establish a *Brady* violation.

*The Evidence Was So Material as to Prejudice Stamps' Defense.*

After establishing favorability, it is easy to understand why evidence of Campbell's charge was so material as to prejudice Stamps' defense under the third prong. As Stamps' asserts in his brief, if the State had turned over this evidence, Stamps could have impeached Walterbach's testimony and Fithian's testimony about responding to an armed felony call. Stamps would have had the ability to strengthen his alibi defense and weaken his connection to the gun.

Moreover, it is readily apparent how important a role Campbell's false report played in his trial given the jury's two read-back requests for Walterbach's hearsay testimony. During the second read-back request, the jury even indicated that it was hung on two counts. As a result, it is reasonable to conclude that if Stamps had known about Campbell's charge in time to attack Walterbach's testimony, the jury might have discredited Walterbach's testimony and reached a different verdict.

The State counters that Stamps was not prejudiced for two reasons. First, the State repeats its arguments why the charge was not favorable, arguing that Stamps could not have been prejudiced given that he could not have brought in evidence of Campbell's charge at trial. As discussed in the preceding section, however, this argument fails.

Second, the State argues that because Stamps learned about Campbell's charge on the second day of trial and the trial court ruled that this evidence could not come in for evidentiary reasons, Stamps could not have been prejudiced. Nevertheless, this court has held that "'[e]vidence not disclosed to the defendant before trial is not suppressed or withheld by the State if the defendant has personal knowledge thereof, or if the facts become available to him during trial and *he is not prejudiced in defending against these new facts*. [Citations omitted.]'" (Emphasis added.) *State v. Stevens*, 36 Kan. App. 2d 323, 332, 138 P.3d 1262 (2006), *aff'd* 285 Kan. 307, 172 P.3d 570 (2007) (quoting *State v.*

40

*Barncord,* 240 Kan. 35, 43, 726 P.2d 1322 [1986]). Here, although Stamps learned about the evidence during trial, Stamps was clearly prejudiced in defending against the new facts because he was unable to impeach Walterbach or Fithian or to use the charge to strengthen his defense. Consequently, both of the State's arguments regarding prejudice fail.

Because Stamps successfully established that evidence of Campbell's charge was so material as to prejudice his defense, he has successfully established that the State violated the third prong of the *Brady* violation test. Thus, the trial court erred by ruling that the State did not commit a *Brady* violation. In turn, because the trial court made an error of law, the trial court abused its discretion when it denied Stamps' motion for mistrial and motion for new trial.

Convictions reversed, remanded with directions to suppress the cocaine evidence obtained during the search of Stamps' car, and remanded for a new trial.